| | |
|---|---|
| 1 | MAYER BROWN LLP |
| 2 | JOHN NADOLENCO (SBN 181128) |
|   | *jnadolenco@mayerbrown.com* |
| 3 | DANIEL QUEEN (SBN 292275) |
| 4 | *dqueen@mayerbrown.com* |
|   | 350 South Grand Avenue, 25th Floor |
| 5 | Los Angeles, California  90071-1503 |
| 6 | Telephone:   (213) 229-9500 |
|   | Facsimile:   (213) 625-0248 |
| 7 | |
| 8 | HOGAN LOVELLS US LLP |
|   | TOM BOER (SBN 199563) |
| 9 | *tom.boer@hoganlovells.com* |
| 10 | 3 Embarcadero Center, Suite 1500 |
|    | San Francisco, CA 94111 |
| 11 | Telephone: (415) 374-2300 |
| 12 | Facsimile: (415) 374-2499 |
| 13 | Attorneys for Defendant |
| 14 | 3M Company |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| Orange County Water District, City of Anaheim, East Orange County Water District, City of Fullerton, City of Garden Grove, Irvine Ranch Water District, City of Orange, City of Santa Ana, Serrano Water District, City of Tustin, and Yorba Linda Water District,<br><br>    Plaintiffs,<br><br>  vs.<br><br>3M Company, E.I. Du Pont De Nemours & Company, The Chemours Company, Corteva, Inc., DuPont de Nemours, Inc., Decra Roofing Systems, Inc., and Doe Defendants 1-100 inclusive,<br><br>    Defendants. | Case No. 8:21-cv-1029<br><br>**NOTICE OF REMOVAL**<br><br>**JURY TRIAL DEMANDED** |

Defendant The 3M Company ("3M"), by undersigned counsel, hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1441, 1442(a)(1), and 1446, from the Superior Court of the State of California for the County of Orange, to the United States District Court for the Central District of California, Southern Division. 3M is entitled to remove this action based on federal officer jurisdiction under 28 U.S.C. § 1442(a)(1). As further grounds for removal, 3M states as follows:

## **PRELIMINARY STATEMENT**

1. Plaintiffs seek to hold 3M and other Defendants liable for their alleged conduct in designing, manufacturing, and selling per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA"), and perfluorooctane sulfonic acid ("PFOS"), that purportedly impacted local groundwater and surface waters and thereby contaminated Plaintiffs' water supplies.

2. The alleged contamination plausibly resulted—at least in part—from the use, storage, or disposal of PFAS-containing aqueous film-forming foams ("AFFF") which were developed for sale to the United States military in accordance with the rigorous military specifications ("MilSpec"). Plaintiffs themselves have identified PFAS releases at military bases in the vicinity of their water supplies as likely sources of the contamination for which they are seeking to recover through this litigation. And the U.S. Department of Defense ("DOD") has determined that AFFF use at those military bases is responsible for the PFAS releases there. Because Plaintiffs' claims arise from alleged PFAS contamination that plausibly derives, at least in part, from the use of MilSpec AFFF, 3M intends to assert the federal government contractor defense in response to those claims.

3. 3M thus is entitled to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), to have its federal defense adjudicated in a federal forum. Multiple courts have held that AFFF manufacturers properly removed cases to federal court on the ground that the plaintiffs' claims plausibly arose at least in part from MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard*, No. 1:20-cv-1080, 2021

WL 744683, at *4 (W.D. Mich. Jan. 6, 2021); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.* ("*In re AFFF*"), No. 2:18-mn-2873, 2019 WL 2807266, at *2 (D.S.C. May 24, 2019); *Ayo v. 3M Comp.*, No. 18-cv-0373, 2018 WL 4781145, at *6-15 (E.D.N.Y. Sept. 30, 2018). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

## **PLAINTIFFS' COMPLAINT**

4. This action was filed on December 1, 2020, in the Superior Court of the State of California for the County of Orange, bearing Case No. 30-2020-01172419-CU-PL-CXC. (Ex. 1, Complaint.)[1] 3M was served with the complaint on December 4, 2020. (Ex. 2, Proof of Service of Summons.) The operative complaint in this action is Plaintiffs' Second Amended Complaint, which Plaintiffs filed on May 19, 2021. (Ex. 3, Second Amended Complaint ("Complaint" or "Compl.").)

5. The Complaint pleads that Plaintiff Orange County Water District ("OCWD") is responsible for managing the Orange County Groundwater Basin ("Basin")—a groundwater aquifer underlying portions of central and northern Orange County that allegedly is one of "Southern California's greatest water supplies." (Ex. 3, Compl. ¶ 1; *see also id.* ¶¶ 14, 67.) OCWD also allegedly manages water supply from the Santa Ana River by capturing surface water that OCWD "recharges" into the Basin. (*Id.* ¶ 1.) The Complaint further pleads that the other named Plaintiffs (which include the City of Anaheim, East Orange County Water District, City of Fullerton, City of Garden Grove, Irvine Ranch Water District, City of Orange, City of Santa Ana, Serrano Water District, City of Tustin, and Yorba Linda Water District) are municipal corporations and special districts that own and

---

[1] All exhibits are attached to the Declaration of Daniel Queen which is being filed contemporaneously with this Notice of Removal.

operate public water systems, and the water they provide to their customers is extracted from the Basin. (*Id.* ¶¶ 2, 14; *see also id.* ¶¶ 24-33.)

6. Plaintiffs allege that they have brought this action to recover costs and obtain other relief relating to "widespread contamination of surface water and groundwater within the Basin with" PFOS and PFOA, which purportedly pose risks to human health. (*Id.* ¶¶ 3-4.) Specifically, Plaintiffs "seek abatement of an ongoing nuisance, to recover compensatory and all other damages and relief, including all necessary funds to compensate Plaintiffs for the costs of investigating and remediating the contamination of surface water and groundwater impacted by PFOA, PFOS, and PFBS [perfluorobutanesulfonic acid] … , designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA, PFOS, and PFBS … from public water supplies, and for such other damages and relief the Court may order." (*Id.* ¶ 8.)

7. Plaintiff alleges that 3M manufactured, marketed, and sold PFAS chemicals (including PFOS and PFOA) as well as products containing them in the State of California. (*See id.* ¶¶ 102-08.) Plaintiff further alleges that 3M owns and operates the "3M Corona Facility" in Temescal Canyon; that 3M uses PFAS in the manufacture of roofing products at the facility; that 3M also has sold PFAS chemicals to DECRA Roofing Systems, Inc., for use in manufacturing roofing products at an adjacent facility in Corona, California; and that PFAS releases from the two facilities have contaminated Plaintiffs' water supplies with PFOA and PFOS. (*See id.* ¶¶ 282-291.)

8. Plaintiffs assert claims against 3M and other Defendants for Strict Products Liability Based on Design Defect (*id.* ¶¶ 292-314), Strict Products Liability Based on Failure to Warn (*id.* ¶¶ 315-37), Continuing Trespass (*id.* ¶¶ 338-62), Public and Private Nuisance (*id.* ¶¶ 363-96), Negligence (*id.* ¶¶ 397-412), liability

- 3 -
NOTICE OF REMOVAL; CASE NO. 8:21-CV-1029

under the Orange County Water District Act, Cal. Water Code App'x 40-1 *et seq.* (*id.* ¶¶ 413-422), and declaratory relief (*id.* ¶¶ 423-30).[2]

## **THE PROCDEURAL REQUIREMENTS FOR REMOVAL UNDER 28 U.S.C. §§ 1441 AND 1446 ARE MET**

9. Venue for the removal of this action is proper in this Court pursuant to 28 U.S.C. §§ 84(c)(3) and 1441(a) because the Superior Court of the State of California for the County of Orange is located within the Central District of California, Southern Division.

10. 3M is not required to notify or obtain the consent of any other Defendant in this action to remove this action as a whole under § 1442(a)(1). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Linden v. Chase Manhattan Corp.*, 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999); *Torres v. CBS News*, 854 F. Supp. 245, 246 n.2 (S.D.N.Y. 1994).

11. Pursuant to 28 U.S.C. § 1446(a), copies of "all process, pleadings, and orders served upon [3M]" in this action as of this date are being submitted to the Court along with the Notice of Removal as Exhibit 4.

12. This Notice of Removal is timely filed because "the case stated by the initial pleading [wa]s not removable" and no "other paper" served by Plaintiffs upon 3M has disclosed a basis for removal. 28 U.S.C. § 1446(b); *see Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689, 694-95 (9th Cir. 2005) ("notice of removability under § 1446(b) is determined through examination of the four corners of the applicable pleadings," in which "the ground for removal must be revealed affirmatively"); *accord Durham*, 445 F.3d at 1250. 3M is removing this action based on other information—not contained in the complaint or any other paper served by Plaintiffs in this litigation—identifying MilSpec AFFF as a plausible source of the alleged

---

[2] Plaintiffs also assert fraudulent transfer claims under California and Delaware law against Defendants E.I. Dupont de Nemours and Company, The Chemours Company, Corteva, Inc., and DuPont De Nemours, Inc. (Compl. ¶¶ 431-76.)

contamination. As a result, removal of this action is timely. *See Roth v. CHA Hollywood Med. Ctr., L.P.*, 720 F.3d 1121, 1125 (9th Cir. 2013).

13. Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon all other parties to this case, and 3M is filing a copy with the Clerk of the Superior Court of the State of California for the County of Orange.

14. By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue, and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

15. 3M reserves the right to amend or supplement this Notice of Removal. If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(A)(1)

16. Removal here is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority, and those actions have a causal nexus with the plaintiff's claims; and (c) it can assert a "colorable" federal defense. *Durham*, 445 F.3d at 1251; *accord Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989); *Goncalves ex rel. Goncalves v. Rady Children's Hosp. S.D.*, 865 F.3d 1237, 1244 (9th Cir. 2017).

17. Removal rights under the federal officer removal statute, 28 U.S.C. § 1442, are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442 "protect[s] federal officers" and "guarantee[s] its agents

access to a federal forum if they are sued or prosecuted." *Durham*, 445 F.3d at 1253. This important federal policy "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, the statute must be "liberally construed" in favor of removal. *Durham*, 445 F.3d at 1252 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)).

18. All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that Plaintiff's injuries were caused at least in part by MilSpec AFFF. *See, e.g.*, *Nessel*, 2021 WL 744683, at *4 (denying motion to remand in PFAS case against AFFF manufacturers because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo*, 2018 WL 4781145, at *6-15 (denying motion to remand and finding that federal officer removal was proper in case against AFFF manufacturers). The court overseeing the *In re AFFF* multi-district litigation has also found on multiple occasions that removal under § 1442(a)(1) is proper where the notice of removal alleges that plaintiffs' claimed injuries were caused, at least in part, by MilSpec AFFF. *See In re AFFF*, 2019 WL 2807266, at *2-3 (federal officer removal statute "entitl[ed] [AFFF manufacturers] to have removed New York's tort claims and [their] federal defense to federal court"); Order 3-5, *In re AFFF*, No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019); Order 3-6, *In re AFFF*, No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019). Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings clearly show that removal to federal court is proper in this case.

### A. MilSpec AFFF

19. Since the late 1960s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the United States Naval Research Laboratory developed

AFFF—its researchers were granted the first AFFF patent in 1966.[3] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[4]

20. The manufacture and sale of AFFF procured by the military is governed by MilSpecs created and administered by Naval Sea Systems Command. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[5] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[6] Prior to such listing, a "manufacturer's … products are examined, tested, and approved to be in conformance with specification requirements."[7] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[8] After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[9] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where

---

[3] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[4] U.S. Navy, NRL/MR/1001-06-8951, U.S. Naval Research Lab., *The U.S. Naval Research Laboratory (1923-2005): Fulfilling the Roosevelts' Vision for American Naval Power*, at 37 (June 30, 2006) ("*Fulfilling the Roosevelts' Vision*"), http://bit.ly/2mujJds.

[5] *See* Mil-F-24385 (1969). The November 1969 MilSpec and all its revisions and amendments through April 2020 (MIL-PRF-24385F(4)) are available at https://tinyurl.com/yxwotjpg.

[6] MIL-PRF-24385F(4) § 3.1 (2020).

[7] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[8] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* Dep't of Defense SD-6, *supra* note 6, at 3.)

[9] Dep't of Defense SD-6, *supra* note 7, at 1.

such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[10]

21. From its inception until very recently, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their precursors—the very compounds at issue in the Complaint here.[11] The current MilSpec expressly contemplates the presence of PFOA and PFOS (subject to recently imposed limits) in AFFF formulations.[12] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[13]

**B. The Alleged PFAS Contamination Of Plaintiffs' Water Supplies Plausibly Derives, At Least In Part, From MilSpec AFFF**

22. Upon information and belief, the PFOS and PFOA chemicals that allegedly are contaminating the Basin have derived at least in part from the use, storage, or disposal of MilSpec AFFF at military bases and other sites in or near Orange County. Accordingly, Plaintiffs' claims to recover for contamination of the Basin arise, at least in part, from MilSpec AFFF.

23. There are at least three current or former military bases in Orange County where contamination of groundwater from PFOS and PFOA has been identified: The former Marine Corps Air Base Tustin in Tustin, California ("MCAS

---

[10] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[11] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[12] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[13] *Id.* § 6.6.

Tustin"); the former Marine Corps Air Station El Toro in Irvine, California ("MCAS El Toro"); and the Joint Forces Training Base in Los Alamitos, California ("JFTB Los Alamitos"). *See* Ex. 5, Naval Facilities Engineering Command, *Per-and Polyfluoroalkyl Substances Update: Former Marine Corps Air Station Tustin, Tustin, California* 1823-26 (Oct. 8, 2020) ("MCAS Tustin PFAS Update") (summarizing PFAS investigation and identifying plumes of PFOS and PFOA at MCAS Tustin); Ex. 6, Naval Facilities Engineering Command, *Per- and Polyfluoroalkyl Substances Update: Fomer Marine Corps Air Station El Toro, Irvine, California* 1847-53 (Mar. 17, 2021) ("MCAS El Toro Update") (summarizing PFAS investigation and identifying plumes of PFOS and PFOA at MCAS El Toro); Ex. 7, D. Cloud, A. Philips, and T. Barboza, *Firefighting foam leaves toxic legacy in Californians' drinking water*, L.A. Times, at 1869 (Oct. 8, 2020) ("L.A. Times Article") ("Recently released Pentagon documents obtained through a public records request . . . showed three more bases in California with elevated contamination levels" including JFTP Los Alamitos).[14]

24. Upon information and belief, the DOD has determined that "[h]istorical AFFF use [is] considered the most likely source of PFAS releases" at military bases in Orange County. *E.g.*, Ex. 5, MCAS Tustin PFAS Update 1827; Ex. 8, Naval Facilities Engineering Command, *Per- and Polyfluoroalkyl Substances Update: Fomer Marine Corps Air Station El Toro, Irvine, California* 1880 (Sept. 9, 2020) (same); *see also* Ex. 7, L.A. Times Article 1867 ("Firefighting foam is considered a major contributor to the contamination" at California bases). Any AFFF used, stored, or discharged at those military sites would have been MilSpec AFFF.

25. Upon information and belief, OCWD is itself already engaged in ongoing efforts to monitor and investigate PFAS contamination of the Basin that has

---

[14] *See also* California State Water Resources Control Board, *PFAS—Military*, https://www.waterboards.ca.gov/pfas/military.html (identifying 62 military facilities in California "with a known or suspected" PFAS release).

1  resulted from AFFF releases at military bases. *See, e.g.*, Ex. 9, Orange County Water
2  District, *OCWD Update* 1892 (Mar. 2021) (OCWD "PFAS monitoring" will involve
3  testing of "wells in Orange County operating nearby current or former military
4  facilities"); Ex. 10, Orange County Water District, *OCWD PFAS Update* 1896 (Mar.
5  26, 2020) ("California . . . ha[s] found that PFAS chemicals, such as PFOA and PFOS
6  have made their way into our local groundwater, including near . . . military bases
7  where these chemicals are commonly used."); *see also* Ex. 7, L.A. Times Article
8  1864-65 ("In . . . Orange County . . . , PFAS have been detected in . . . public water
9  systems outside the boundaries of military installations, records show.").

26. OCWD has specifically identified MCAS Tustin, MCAS El Toro, and JFTB Los Alamitos as "[p]otential [g]eneral sources of PFAS releases" that have contributed to contamination of the Basin. *See* Ex. 11, Orange County Water District, *PFAS in the Orange County Groundwater Basin: Occurrence, Regulation, and Impacts on Local Water Supply* 1917 (June 17, 2020) (identifying "Military Bases," including MCAS Tustin, MCAS El Toro, and JFTB Los Alamitos, as "Potential General Sources of PFAS Releases"); *see also* Ex. 12, *PFAS Treatment for Municipal Water Supply* 1943 (Apr. 29, 2020) (OCWD presentation identifying "Three Military Bases" as "Potential Local Sources"). OCWD is monitoring and investigating those military bases as sources of the PFAS contamination for which they seek to recover in this case. *See* Ex. 13, Orange County Water District, *PFAS Monitoring in Orange County & Upper Santa Ana River Watershed* 1993 (May 2, 2019) ("Ongoing OCWD [m]onitoring" "at military sites (El Toro MCAS, Tustin MCAS, etc.)").

27. Additionally, on February 16, 2021, the California State Water Resources Control Board issued an order requiring four of the named Plaintiffs to monitor and test for PFAS because DOD "has identified facilities that have used AFFF known to contain PFAS in the State of California" in the vicinity of Plaintiffs' water supplies. *See* Ex. 14, California State Water Resources Control Board, Division of Drinking Water, Order DW 2021-0001-DDW, General Order Requiring

Monitoring for [PFAS] ¶ 13 ("Water Board Order").[15] A letter from the Board to Plaintiffs stated that Plaintiffs were being required to test and monitor for PFAS because the Board had "determined that it is necessary to test sources located within and adjacent to the [DOD] facilities." Ex. 16, Letter from California State Water Resources Control Board 2018 (Feb. 16, 2021). The Board's order requiring PFAS monitoring of Plaintiffs' water supplies due to their proximity to military bases confirms that Plaintiffs' claims plausibly derive, at least in part, from releases of PFAS from military bases where MilSpec AFFF would have been used.

28. Because Plaintiffs' claims to recover for PFOS and PFOA contamination likely arise—at least in part—from the use, storage, or disposal of MilSpec AFFF at nearby military bases, 3M is entitled to remove this case as a whole to federal court under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).[16]

### C. All The Requirements Of 28 U.S.C. § 1442(a)(1) Are Satisfied

#### 1. The "Person" Requirement Is Satisfied

29. The first requirement for removal under the federal officer removal statute is satisfied because 3M (a corporation) is a "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'" *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1). The Ninth Circuit has recognized that a non-natural entity is a "person" for purposes of § 1442(a)(1). *See Goncalves*, 865 F.3d at 1244; *accord Lombardi v. TriWest Healthcare All. Corp.*, No. CV-08-02381-PHX-FJM,

---

[15] Plaintiffs City of Garden Grove, Irvine Ranch Water District, City of Santa Ana, and City of Tustin were subject to the Order. *See* Ex. 15, Water Board Order Ex. A, at 2010-11.

[16] Upon information and belief, there likely are other sites where the use of MilSpec AFFF has contributed to the contamination of Plaintiffs' water supplies. For instance, in 1986, AFFF from a Marine Corps fire station reportedly was used for firefighting activities in Orange County following the rupture of a gasoline pipeline. Ex. 17, Edward G. Fleming, *Dam as Defense*, Fire Engineering, Apr. 1, 1988, at 2027.

2009 WL 1212170, at *2 (D. Ariz. May 4, 2009).

**2. The "Causal Nexus" Requirement Is Satisfied**

30. The second requirement is that the defendant has acted under a federal officer, and that those actions have a causal nexus with the plaintiff's claims. *Durham*, 445 F.3d at 1251.

31. A defendant is "acting under" a federal officer when it assists or helps carry out the duties or tasks of a federal officer. *Goncalves*, 865 F.3d at 1245. The words "acting under" are to be interpreted broadly. *Id.* Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

32. 3M was "acting under" a federal officer here because, in providing MilSpec AFFF, 3M was furnishing a vital product "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission critical military product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members). The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[17] Accordingly, the military has long depended upon outside contractors like 3M to develop and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8-9 (holding that Defendants were "acting under" a federal officer in

---

[17] *Fulfilling the Roosevelts' Vision* at 37.

connection with the manufacture and sale of MilSpec AFFF); *In re AFFF*, 2019 WL 2807266, at *2 (finding "acting under" requirement was satisfied because AFFF manufacturer defendant "has demonstrated that it was manufacturing the product under the U.S. military's guidance"). If 3M and other manufacturers did not provide MilSpec AFFF for use at military bases, the government would have to manufacture and supply the product itself.

33. In designing, manufacturing, and supplying the MilSpec AFFF products at issue, 3M acted under the direction and control of one or more federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.[18] Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the United States Department of Defense.[19]

34. The requirement that a defendant's actions were taken "under color of federal office … has come to be known as the causation requirement." *Isaacson*, 517 F.3d at 137 (internal quotation marks, alterations, and citation omitted). Like the "acting under" requirement, the "hurdle erected by this requirement is quite low." *Goncalves*, 865 F.3d at 1245 (quoting *Isaacson*, 517 F.3d at 137).[20] Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Isaacson*, 517 F.3d at 137.

---

[18] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 5, *supra*.

[19] *See* Dep't of Defense SD-6, *supra* note 7, at 1.

[20] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990, 2011 WL 5109532, at *5 (S.D.N.Y. Oct. 21, 2011).

35. To show a causal nexus with the plaintiff's claims, a defendant need only establish that the act that allegedly caused or contributed to the plaintiff's injury occurred while the defendant was performing its official duties. *Isaacson*, 517 F.3d at 137-38; *see also Papp*, 842 F.3d at 813 (explaining that in order to meet the causation requirement, it is "sufficient for there to be a connection or association between the act in question and the federal office").

36. Here, Plaintiff's claims against 3M arise at least in part from alleged contamination of its water supply with PFAS that plausibly derives from MilSpec AFFF. 3M contends that the use of such chemicals was required by military specifications. The conflict is apparent: MilSpec AFFF was developed for use by the military, and was designed to meet specifications established by the Department of Defense. The liability that Plaintiffs are attempting to impose via state tort law due to the design choices related to the production of MilSpec AFFF would create a conflict in which 3M could not "comply with both its contractual obligations and the state-prescribed duty of care." *Boyle v. United Tech. Corp.*, 487 U.S. 500, 509 (1988); *see also Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'causal connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); *accord In re AFFF*, 2019 WL 2807266, at *3 ("Here, [plaintiff's] claims arise out of use of AFFF products that it claims [the defendant] manufactured and sold, and for which the U.S. military imposes MilSpec standards. The Court . . . finds that the causation element of federal officer removal is satisfied here.").

37. Because Plaintiffs' alleged injuries arise at least in part from MilSpec AFFF, there is a causal connection between those alleged injuries and 3M's actions under color of federal office. It is irrelevant that Plaintiffs do not expressly contend that any of their injuries derive from MilSpec AFFF; the fact that some portion of the alleged injuries could plausibly derive from MilSpec AFFF is sufficient. "In assessing whether a causal nexus exists, [courts] credit the defendants' theory of the case." *Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014); *see also Nessel*, 2021 WL

744683, at *3 (rejecting plaintiffs' argument that federal officer removal was improper because "they do not seek resolution of any claims related to MilSpec AFFF," and explaining that plaintiffs "cannot prevent Defendants from raising the production of MilSpec AFFF as a defense or an alternate theory").

### 3. The "Colorable Federal Defense" Requirement Is Satisfied

38. The third requirement—that the defendant have a "colorable federal defense"—is satisfied by 3M's assertion of the government contractor defense. The Ninth Circuit has recognized that this defense supports removal under § 1442(a)(1). *See Leite*, 749 F.3d at 1124.

39. At the removal stage, a defendant need only show that its government contractor defense is "colorable." *Leite*, 749 F.3d at 1124 (quoting *Jefferson Cty.*, 527 U.S. at 407). "To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." *Isaacson*, 517 F.3d at 139 (citation omitted). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014) (quoting *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n. 12 (2006)).[21] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (citation omitted).

---

[21] *See also Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.").

40. Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

41. 3M has alleged facts that satisfy these elements for purposes of removal. As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.[22] Indeed, 3M's products appeared on the DOD Qualified Products Listing,[23] which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec.[24] *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence … that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); *In re AFFF*, 2019 WL 2807266, at *3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

---

[22] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 5, *supra*.

[23] MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014), http://www.dcfpnavymil.org/Systems/AFFF/QPL%2024385%20HISTORY%20-%20TYPE%203.pdf; MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014), http://www.dcfpnavymil.org/Systems/AFFF/QPL%2024385%20HISTORY%20-%20TYPE%206.pdf.

[24] *See* Dep't of Defense SD-6, *supra* note 7, at 1.

42. Moreover, the U.S. government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand.[25] Indeed, it is clear that the United States has long understood that AFFF may contain or break down into PFOS and/or PFOA, that AFFF constituents can migrate through the soil and potentially reach groundwater, and that it has been reported that this may raise environmental or health issues.[26]

43. In fact, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[27] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[28] More recently, in a November 2017 report to Congress, the Department of Defense acknowledged the concerns raised by the EPA regarding PFOS and PFOA in drinking water. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and

---

[25] *See, e.g.*, MIL-F-24385 §§ 3.16 & 4.7.16 (Rev. May 2, 1977).

[26] *See, e.g.*, EPA, Revised Draft Hazard Assessment of Perfluorooctanoic Acid and its Salts, at 1-6 (Nov. 4, 2002) (excerpt).

[27] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), http://www.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[28] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

protects assets by quickly extinguishing petroleum-based fires."[29] Until just earlier this year, Naval Sea Systems Command continued to expressly require that MilSpec AFFF contain "fluorocarbon surfactants," [30] and even today the MilSpec contemplates the presence of "PFOS" and "PFOA" in AFFF formulations.[31] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); *In re AFFF*, 2019 WL 2807266, at *3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military were not already aware, [it] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA's] stated concerns with PFOS/PFOA in drinking water . . . .").

44. At a minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *5 (S.D.N.Y. 2011) ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d at 89-90.

---

[29] Dep't of Defense, Aqueous Film Forming Foam Report to Congress, at 1-2 (Oct. 2017) (pub. Nov. 3, 2017).

[30] *See* MIL-PRF-24385F(2) § 3.2 (2017).

[31] MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

45. 3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries to Plaintiffs that were caused in whole or in part by 3M's compliance with military specifications, Plaintiffs are attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

46. Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

* * * * *

WHEREFORE, 3M hereby removes this action from the Superior Court of the State of California for the County of Orange, to the United States District Court for the Central District of Southern Division.

Dated: June 11, 2021

MAYER BROWN LLP
John Nadolenco
Daniel D. Queen

HOGAN LOVELLS US LLP
J. Tom Boer

By: */s/ Daniel D. Queen*
　　　Daniel D. Queen

Attorneys for Defendant
3M Company