# EXHIBIT 3

Exhibit 3
87

1  Alexander I. Leff (SBN 117307)
   Kenneth A. Sansone (SBN 319982)
2  Seth D. Mansergh (SBN 274892)
   **SL ENVIRONMENTAL LAW GROUP, PC**
3  175 Chestnut Street
   San Francisco, CA 94133
4  (415) 348-8300; Fax: (415) 348-8333
   aleff@slenvironment.com
5  smansergh@slenvironment.com
   ksansone@slenvironment.com
6
   Daniel S. Robinson (SBN 244245)
7  Michael W. Olson (SBN 312857)
   **ROBINSON CALCAGNIE, INC.**
8  19 Corporate Plaza Drive
   Newport Beach, CA 92660
9  (949) 720-1288; Fax: (949) 720-1292
   drobinson@robinsonfirm.com
10 molson@robinsonfirm.com

11 Andrew W. Homer (SBN 259852)
   **KELLEY DRYE & WARREN LLP**
12 7825 Fay Avenue, Suite 200
   La Jolla, CA 92037
13 (858) 795-0426
   ahomer@kelleydrye.com
14
   *Attorneys for Plaintiffs*

15                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                          FOR THE COUNTY OF ORANGE

17
   ORANGE COUNTY WATER DISTRICT,        Case No.: 30-2020-01172419-CU-PL-CXC
18 CITY OF ANAHEIM, EAST ORANGE
   COUNTY WATER DISTRICT, CITY OF        SECOND AMENDED COMPLAINT FOR
19 FULLERTON, CITY OF GARDEN GROVE,      DAMAGES AND OTHER RELIEF AND
   IRVINE RANCH WATER DISTRICT, CITY     DEMAND FOR JURY TRIAL:
20 OF ORANGE, CITY OF SANTA ANA,         (1-2) STRICT PRODUCTS LIABILITY
   SERRANO WATER DISTRICT, CITY OF       (DESIGN DEFECT);
21 TUSTIN, AND YORBA LINDA WATER         (3-4) STRICT PRODUCTS LIABILITY
   DISTRICT,                             (FAILURE TO WARN);
22                                       (5-6) TRESPASS;
   Plaintiffs,                           (7-8) PUBLIC AND PRIVATE NUISANCE;
23                                       (9-10) NEGLIGENCE;
   vs.                                   (11) OCWD ACT;
24                                       (12) DECLARATORY RELIEF; AND
   3M COMPANY, E. I. DU PONT DE          (13-16) FRAUDULENT AND VOIDABLE
25 NEMOURS AND COMPANY, THE              TRANSFER
   CHEMOURS COMPANY, CORTEVA, INC.,
26 DUPONT DE NEMOURS, INC.; DECRA        JURY TRIAL DEMANDED
   ROOFING SYSTEMS, INC.; AND DOE
27 DEFENDANTS 1-100, inclusive,

28 Defendants.

Exhibit 3
88

1   Plaintiffs ORANGE COUNTY WATER DISTRICT, CITY OF ANAHEIM, EAST

2   ORANGE COUNTY WATER DISTRICT, CITY OF FULLERTON, CITY OF GARDEN

3   GROVE, IRVINE RANCH WATER DISTRICT, CITY OF ORANGE, CITY OF SANTA ANA,

4   SERRANO WATER DISTRICT, CITY OF TUSTIN, AND YORBA LINDA WATER

5   DISTRICT hereby allege, based on information and belief and investigation of counsel:

6                               **SUMMARY OF THE CASE**

7          1.      Plaintiff Orange County Water District ("OCWD") is a special water district that

8   was formed by the California Legislature in 1933 and is charged with managing the Orange County

9   Groundwater Basin ("Basin"), which is a groundwater aquifer underlying portions of central and

10  northern Orange County, California. OCWD manages three of Southern California's greatest water

11  supplies: the Santa Ana River, the Basin, and the Groundwater Replenishment System ("GWRS").

12  OCWD captures surface water from the Santa Ana River, then recharges the captured flows into

13  the Basin. The GWRS treats wastewater that OCWD obtains from the Orange County Sanitation

14  District, then recharges the treated flows into the Basin. OCWD possesses rights to draw water

15  from, and valuable rights to, inter alia, recharge and store water in, one or more contaminated local

16  aquifers, including, but not limited to, aquifers within the Basin. The District has legally protected

17  interests in the groundwater at issue in this Second Amended Complaint, and in recharge and

18  storage capacity in the contaminated aquifers. OCWD maintains an appropriative right to reclaim

19  or re-appropriate water it has recharged into the Basin. OCWD works to ensure a reliable supply

20  of high-quality water for more than 2.5 million residents in northern and central Orange County,

21  while protecting environmental habitats and natural resources.

22         2.      Plaintiffs City of Anaheim, East Orange County Water District, City of Fullerton,

23  City of Garden Grove, Irvine Ranch Water District, City of Orange, City of Santa Ana, Serrano

24  Water District, City of Tustin, and Yorba Linda Water District (the "Producers") are municipal

25  corporations and special districts that own and operate public water systems that provide drinking

26  water to residents and businesses within their respective service areas. Collectively, the Producers

27  and OCWD are referred to as the "Plaintiffs."

28         3.      Plaintiffs bring this action in order to address widespread contamination of surface

- 2 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
89

water and groundwater within the Basin with the synthetic per- and polyfluoroalkyl substances ("PFAS") perfluorooctanesulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), and perfluorobutanesulfonic acid ("PFBS") to recover costs associated with the contamination of drinking water, surface water and groundwater with PFAS, and further seek abatement of the ongoing nuisance these chemicals constitute in the environment, and for such other action as is necessary to ensure that the PFAS that contaminate the surface water and aquifers supplying source drinking water for OCWD and the Producers do not present a risk to the public. In this Second Amended Complaint, the terms PFAS are intended to include those compounds themselves (including all of their salts and ionic states as well as the acid forms of the molecules) and their chemical precursors.

4.     PFAS are persistent, toxic, and bioaccumulative compounds when released into the environment. PFAS have impacted surface water and groundwater, and now contaminate the water pumped from the Producers' water supply wells. Because of the risks that PFAS pose to human health, the State of California regulates PFOA, PFOS, and PFBS in drinking water at very low levels. The State of California has established notification levels for PFOS of 6.5 parts per trillion ("ppt"), for PFOA of 5.1 ppt, and PFBS of 500 ppt, with response levels for PFOS of 40 ppt, for PFOA of 10ppt, and 5,000ppt for PFBS.[1]

5.     Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M"), E. I. du Pont de Nemours and Company ("Old DuPont"), and The Chemours Company ("Chemours") (together 3M, Old DuPont, and Chemours are referred to as the "Manufacturing Defendants") are major chemical companies that manufactured PFOS and/or PFOA and/or PFBS and/or PFAS-containing products and knew or reasonably should have known that these harmful compounds would reach groundwater, pollute drinking water supplies, render drinking water

---

[1] The State of California has been tracking and is likely to regulate additional PFAS, including PFHxS, PFHxA, PFNA, PFDA, and ADONA. Since suit was filed, the State of California established notification and response levels for PFBS. (https://oehha.ca.gov/media/downloads/water/chemicals/nl/pfbsnl121820.pdf) (last accessed Feb. 1, 2021). Everywhere this Second Amended Complaint identifies PFOS, PFOA, PFBS, or PFAS, these references should be read to also include, as applicable, any other analytes as California begins to regulate them.

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
90

1    unusable and unsafe, and threaten the public health and welfare.

2        6.      Defendant 3M also operates a manufacturing facility at 18750 Minnesota Road,

3    Corona, California ("3M Corona Facility"), which occupies approximately 1,300 acres of land in

4    the Temescal Canyon and, upon information and belief, is a source of PFAS that has impacted the

5    Santa Ana River and the Basin. According to its website, 3M acquired the Corona site from the

6    Blue Diamond Company in 1941, commenced its own manufacturing activities at that site in 1948,

7    and produces specialty roofing granules to the asphalt and metal roofing shingle industries.

8    Plaintiffs believe that 3M has owned and operated the 3M Corona Facility continuously at all times

9    since acquiring it. Plaintiffs also believe that 3M's operations at the 3M Corona Facility have

10   included the manufacture and/or use of PFOS/PFOA and/or their precursors.

11       7.      Defendant DECRA Roofing Systems, Inc. ("DECRA") is a California corporation

12   that caused and/or contributed to the PFAS contamination as further described below and knew or

13   reasonably should have known that these harmful compounds would reach groundwater, pollute

14   drinking water supplies, render drinking water unusable and unsafe, and threaten the public health

15   and welfare. Upon information and belief Defendant DECRA maintains a manufacturing facility

16   at 1230 Railroad Street, Corona, California 92882 and a warehousing, shipping, and receiving

17   facility at an adjacent property at 235 N. Sherman Avenue, Corona, California 92882 (together

18   "DECRA Corona Facilities"). Upon information and belief Defendant DECRA purchases

19   specialty roofing granules from the 3M Corona Facility (and others) and then incorporates those

20   3M specialty roofing granules, which include PFAS ingredients (among others including

21   Scotchgard® coatings and polymer coatings), into its roofing products ("DECRA Roofing

22   Products") that are manufactured and warehoused at, then shipped from the DECRA Corona

23   Facilities to customers throughout Plaintiffs' respective service areas. Based on DECRA's

24   participation in 3M's manufacturing chain of commerce and distribution, as well as how DECRA's

25   own manufacturing, storage, movement, handling, and disposal of PFAS-containing DECRA

26   Roofing Products have caused contamination of ground and surface water with PFAS, DECRA is

27   also strictly liable for the damages Plaintiffs seek.

28   ///

- 4 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
91

8.      Plaintiffs file this lawsuit to seek abatement of an ongoing nuisance, to recover compensatory and all other damages and relief, including all necessary funds to compensate Plaintiffs for the costs of investigating and remediating the contamination of surface water and groundwater impacted by PFOA, PFOS, and PFBS (and other compounds that may subsequently be regulated), designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA, PFOS, and PFBS (and other compounds that may subsequently be regulated) from public water supplies, and for such other damages and relief the Court may order.

9.      In addition, Plaintiffs assert claims under the former Uniform Fraudulent Transfer Act, formerly California Civil Code Section 3439, *et seq.* ("UFTA") and the superseding Uniform Voidable Transactions Act, California Civil Code Section 3439, *et seq.* ("UVTA"), based on a web of transactions that Old DuPont orchestrated to shield significant assets from the Plaintiffs and other creditors.

10.     A principal purpose of this lawsuit is to hold Defendants liable for the costs the Plaintiffs have incurred, and expect to incur, to clean up the groundwater contamination in the Basin caused by the following: (i) the disposal and release of pollutants from the 3M Corona Facility that have directly impacted water quality in the Basin, and (ii) PFAS-containing products manufactured by the Manufacturing Defendants which were introduced into the stream of commerce. Such costs include all necessary funds to investigate, monitor, assess, evaluate, remediate, abate, or contain contamination of groundwater resources within the Basin that are polluted with PFAS. OCWD also seeks to safeguard the quality of the public water resources in the Basin; to prevent pollution or contamination of water supplies; and to assure that the responsible parties – rather than the OCWD, Producers, or taxpayers – bear the cost of responding to and remediating contamination.

11.     Old DuPont has known for decades that it faces unprecedented liabilities for widespread PFAS contamination throughout the country, including, but not limited to, damage to public water systems, drinking water sources, and other natural resources. Despite this knowledge, Old DuPont has sought, and continues to seek, however possible, to prevent injured public water

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
92

1    systems like those that Plaintiffs own and operate from being able to recover on their eventual

2    judgments.

3            12.     Old DuPont has sought to limit its PFAS liability by engaging in a series of complex

4    restructuring transactions, including, but not limited to (i) the "spinoff" of its performance

5    chemicals business (which included Teflon and other products, the manufacture of which involved

6    the use of PFOA and other PFAS) into defendant Chemours; (ii) a purported merger with The Dow

7    Chemical Company ("Old Dow"); (iii) the transfer of Old DuPont's historic assets to other entities,

8    including defendant DuPont de Nemours Inc. ("New DuPont"); and (iv) ultimately, the spin-off of

9    Old DuPont to a new parent company named Corteva, Inc. These transactions were all designed

10   to shield billions of dollars in assets from the PFAS liabilities that Old DuPont tried to isolate in

11   Chemours.

12           13.     Old DuPont also sought to hide critical details of these transactions by burying them

13   in non-public schedules to agreements in an attempt to keep the parties such as Plaintiffs in the

14   dark. As a result, Old DuPont has shed more than $20 billion in tangible assets through

15   restructuring efforts and attempted to put those assets outside of Plaintiffs' reach. This is the exact

16   type of scheme that the UFTA and UVTA are designed to prevent and/or unwind.

17                                        **THE PARTIES**

18           14.     Plaintiff Orange County Water District is a special water district with its principal

19   place of business at 18700 Ward Street, Fountain Valley, California, 92708. OCWD was formed

20   by the California Legislature in 1933 to, among other things, maintain, protect, replenish, and

21   manage the Basin and associated water resources and infrastructure. The Basin provides a water

22   supply to nineteen municipal water agencies and special districts that serve more than 2.5 million

23   Orange County residents. The Producers own and maintain systems that supply water, much of

24   which is extracted by the Producers from the Basin, directly to their customers with certain

25   assistance and oversight from OCWD.

26           15.     Under its enabling legislation, OCWD has the power to "[t]ransport, reclaim,

27   purify, treat, inject, extract, or otherwise manage and control water for the beneficial use of persons

28   or property within the district and protect the quality of groundwater supplies within the district."

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
93

OCWD Act § 2, subd. (6)(j).) In furtherance of these goals, OCWD may "commence, maintain, intervene in, defend, and compromise . . . any and all actions and proceedings . . . to prevent . . . diminution of the quantity or pollution or contamination of the water supply of the district." (*Id.* at subd. (9).)

16.    The Legislature expressly granted OCWD the right and duty, among other things, to conduct any investigations of the quality of the groundwater within the Basin to determine whether that water is contaminated or polluted, to perform any necessary investigation, cleanup, abatement, or remedial work to prevent, abate, or contain any threatened or existing contamination or pollution of the surface or groundwater within its territorial jurisdiction, and to recover the costs of any such activities from the persons responsible for the contamination or threatened contamination. (OCWD Act § 8.)

17.    The Legislature also expressly granted OCWD the right and duty, among other things, to litigate in order to protect groundwater resources and to represent the rights of water users within its territorial jurisdiction. (OCWD Act § 2.) OCWD has protectable legal interests in the surface water and groundwater within its territorial jurisdiction, including the right to extract and appropriate surface water and groundwater, replenish the Basin, and to recover the costs of performing these services from anyone who contaminates surface and groundwater in OCWD's territorial jurisdiction.

18.    OCWD has protectable legal interests in the groundwater within the Basin, including the right to extract groundwater, replenish the aquifer, and to recover the costs of performing these services from anyone who appropriates groundwater in OCWD's service area.

19.    Specifically, OCWD has (i) invested in the GWRS and recharges up to 100 million gallons of water per day into the Basin; (ii) acquired and initiated litigation to establish and protect water rights to well over one hundred thousand acre feet of water per year; (iii) purchased tens of thousands of acre feet of water per year from the Metropolitan Water District of Southern California ("MWD"); (iv) stored and delivered water under contract for a fee charged to the MWD; and (v) recharged and stored in the Basin the water it has acquired, reclaimed, and recycled.

20.    OCWD is the exclusive owner of water rights, including water rights set forth in

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
94

1  Permit 21243 issued by the California State Water Resources Control Board on or about June 30,

2  2009, which permit allows the District to appropriate up to 362,000 acre feet per year from the

3  Santa Ana River for underground storage and/or surface storage for municipal, industrial, and other

4  beneficial uses and designates the place of use of that water as anywhere "within the Area

5  overlying the Orange County Groundwater Basin."

6      21.    By storing water in the Basin, for itself and under contract, OCWD does not intend

7  to abandon it. OCWD intends that the water recharged into the Basin will be recaptured for further

8  beneficial use solely by authorized users (who pay the OCWD a replenishment fee for each acre-

9  foot of water extracted) and buyers for authorized uses, and intends to retain the right to prevent

10  contamination, unauthorized extractions, or other interference with the water while it is stored in

11  the Basin. In addition, the District intends that the water in the Basin be used to augment and

12  preserve groundwater levels necessary to maintain the Basin as a long-term water source.

13      22.    OCWD is also the fee owner, lease holder, and/or easement holder of real property

14  contaminated with PFAS throughout the Basin and outside the Basin including, but not limited to,

15  approximately six miles of the Santa Ana River, land and mineral rights in the cities of Anaheim,

16  Orange, Yorba Linda and elsewhere.

17      23.    OCWD has conducted, and will continue to conduct, investigations of the quality

18  of the groundwater within the Basin, to perform any necessary investigation, cleanup, abatement,

19  or remedial work to prevent, abate, or contain any threatened or existing contamination or pollution

20  of the surface water or groundwater within its territorial jurisdiction; to further delineate the

21  contamination within the Basin; to design and implement remedial systems to clean up the

22  contamination; to acquire access and property rights necessary to install wells and other equipment

23  to extract and convey the contaminated water; to construct treatment systems to remove the

24  contaminants; and to operate and maintain those extraction and treatment systems until the cleanup

25  is complete. OCWD seeks to protect the surface water and groundwater resources from the threat

26  of further pollution by taking response actions aimed at stopping the horizontal and vertical

27  migration of and remediating the contaminants.

28  ///

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
95

24.     Plaintiff City of Anaheim is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 200 South Anaheim Boulevard, Anaheim, California 92805. Anaheim owns, operates, and maintains a public water system with over 64,000 connections. One or more of Anaheim's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS. For purposes of this Second Amended Complaint, relevant regulatory limits include the notification and reference levels governed by the State Water Resources Control Board, Order DW 2020-0003-DDW.

25.     Plaintiff East Orange County Water District ("EOCWD") is a special water district that was established in 1961 serving Central Orange County, California with its primary address at 185 North McPherson Road, Orange, California 92869. EOCWD owns, operates, and maintains a public water system with over 1,200 connections. One or more of EOCWD's potable water wells have exceeded the regulatory limits for PFOS and/or PFOA and/or PFBS.

26.     Plaintiff City of Fullerton is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 303 Commonwealth Avenue, Fullerton, California 92832. Fullerton owns, operates, and maintains a public water system with approximately 32,000 connections. One or more of Fullerton's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS.

27.     Plaintiff City of Garden Grove is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 11222 Acacia Parkway, Garden Grove, California 92840. Garden Grove owns, operates, and maintains a public water system with over 34,000 connections. One or more of Garden Grove potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS.

28.     Plaintiff Irvine Ranch Water District ("IRWD") is a California Water District that was established in 1961 serving Central Orange County, California with a primary address at 15600 Sand Canyon Ave, Irvine, California 92618. IRWD owns, operates, and maintains a public water system with over 115,000 connections. One or more of IRWD's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS.

29.     Plaintiff City of Orange is a municipal corporation organized and existing under

- 9 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
96

1   the Constitution and laws of the State of California, with its primary address at 300 East Chapman

2   Avenue, Orange, California 92866. Orange owns, operates, and maintains a public water system

3   with over 36,000 connections. One or more of Orange's potable water wells have exceeded

4   regulatory limits for PFOS and/or PFOA and/or PFBS.

5       30.     Plaintiff City of Santa Ana is a municipal corporation organized and existing under

6   the Constitution and laws of the State of California, with its primary address at 20 Civic Center

7   Plaza, Santa Ana, California 92701. Santa Ana owns, operates, and maintains a public water

8   system with approximately 45,000 connections. One or more of Santa Ana's potable water wells

9   have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS.

10      31.     Plaintiff Serrano Water District ("Serrano") is a special water district that was

11  established in 1876 and provides potable water to the City of Villa Park and a small portion of the

12  City of Orange. Serrano has a primary address at 18021 Lincoln Street, Villa Park, California

13  92861 and owns, operates, and maintains a public water system with over 2,200 connections. One

14  or more of Serrano's potable water wells have exceeded regulatory limits for PFOS and/or PFOA.

15      32.     Plaintiff City of Tustin is a municipal corporation organized and existing under the

16  Constitution and laws of the State of California, with its primary address at 300 Centennial Way,

17  Tustin, California 92780. Tustin owns, operates, and maintains a public water system with over

18  14,000 connections. One or more of Tustin's potable water wells have exceeded regulatory limits

19  for PFOS and/or PFOA and/or PFBS.

20      33.     Plaintiff Yorba Linda Water District ("YLWD") is a special water district that

21  serves residents of Yorba Linda and portions of Placentia, Brea, Anaheim, and areas of

22  unincorporated Orange County. Its primary address is 1717 East Miraloma Avenue, Placentia,

23  California 92870. YLWD owns, operates, and maintains a public water system with over 25,383

24  connections. One or more of YLWD's potable water wells have exceeded regulatory limits for

25  PFOS and/or PFOA and/or PFBS.

26      34.     Each of the Producers are fee owners, lease holders, and/or easement holders of

27  real and personal property contaminated with PFAS, including but not limited to, fee, lease and/or

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
97

easement interests in real property where public water supply extraction wells, distribution systems, and reservoirs are located.

35.     Defendant 3M Company ("3M") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

36.     3M also operates a facility in Corona, California ("3M Corona Facility"), which occupies 1,300 acres of land in the Temescal Canyon. According to its website, 3M acquired the 3M Corona Facility in 1941 and began manufacturing there in 1948. Based on information and belief, 3M has additional facilities in Irvine, California; Monrovia, California; and Northridge, California.

37.     3M does business throughout the United States, including conducting business in California, and is registered to do business in California.

38.     Defendant E. I. du Pont de Nemours and Company ("Old DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

39.     Old DuPont has done business throughout the United States, including conducting business in California, and is registered to do business in California.

40.     Defendant The Chemours Company ("Chemours") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours was a wholly owned subsidiary of Old DuPont. In July 2015, Old DuPont completed its spin-off of Chemours as a separate publicly-traded entity. In connection with the spin-off, Chemours assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in California, around the country and indeed the world.

41.     Chemours has received and begun manufacturing certain product lines from Old DuPont, including some product lines involving manufacture, sale, and distribution of PFAS-containing intermediates and products.

- 11 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
98

42.     Chemours does business throughout the United States, including conducting business in California, and is registered to do business in California.

43.     Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("New DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

44.     New DuPont does business throughout the United States, including conducting business in California.

45.     Defendant Corteva, Inc. ("Corteva") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805.

46.     Corteva does business throughout the United States, including conducting business in California, and is registered to do business in California.

47.     Defendant DECRA Roofing Systems, Inc. ("DECRA") is a corporation duly organized under the laws of the State of California, with its principal place of business located at 1230 Railroad Street, Corona, California 92882. Based on information and belief, in addition to maintaining its principal place of business at the same address, Defendant DECRA also maintains a manufacturing facility at 1230 Railroad Street, Corona, California 92882, as well as a warehousing, shipping, and receiving facility at an adjacent property at 235 N. Sherman Avenue, Corona, California 92882. DECRA has owned and/or operated its manufacturing, warehousing, shipping, and receiving facilities at the addresses listed above since at least 1998, and as early as 1989 when it was operating under the tradename "Tasman Roofing, Inc." http://web.archive.org/web/20010411164609/http://www.decra.com/aboutus/index.html (last accessed May 18, 2021).

48.     Based on information and belief, Defendant DECRA engaged in business with 3M to order, purchase, and/or otherwise obtain specialty roofing granules manufactured at the 3M Corona Facility, for the DECRA Roofing Products containing PFAS to be installed in homes and structures and/or eventually discarded in or around the Basin.

49.     Defendant DECRA's website represents that "[w]e use only 3M granules." During

- 12 -

1    the time DECRA has been operating at its Corona Facility, under its current name and its prior

2    tradename, 3M used PFAS in the manufacturing of 3M's roofing granules, including granules sold

3    to DECRA for use in DECRA's Roofing Products. DECRA therefore participates in the chain of

4    distribution and stream of commerce of roofing materials containing PFAS, which are ultimately

5    released to the environment, where they contaminate Plaintiffs' water supply.

6          50.    According to Defendant 3M's website, "3M produces the granules, but it's the

7    shingle manufacturers who create the shingles that you see on homes and commercial buildings

8    across the country. 3M is honored to partner with multiple shingle manufacturers across the

9    country, allowing us to provide hundreds of shingle options so that homeowners are certain to find

10    a shingle to suit their home. Check out our manufacturers' websites below to learn more about the

11    vast number of shingle and roofing options available! Manufacturers using 3M granules: […]

12    DECRA." (https://www.3m.com/3M/en_US/roofing-granules-us/resources/, last accessed May

13    18, 2021).

14          51.    Based on information and belief, PFAS from DECRA's Roofing Products have

15    been and continue to be released to the environment and to contaminate Plaintiffs' water supply in

16    at least four ways: (a) through the use and disposal of PFAS-containing 3M roofing granules at

17    DECRA's Corona manufacturing facility; (b) through the handling and storage of PFAS-

18    containing DECRA Roofing Products at DECRA's Corona warehousing facility; (c) through

19    stormwater that includes runoff that comes in contact with PFAS-containing DECRA Roofing

20    Products installed within or hydrologically upgradient of the Basin; and (d) when PFAS-containing

21    DECRA Roofing Products are disposed of in solid waste landfills within or hydrologically

22    upgradient of the Basin.

23          52.    Based on information and belief, PFAS were historically released to the

24    environment from DECRA's manufacturing and warehouse facilities in Corona during the

25    manufacturing, finishing, handling, storage, shipping, and receiving of PFAS-containing DECRA

26    Roofing Products and associated materials carried out at that facility. Once released to the

27    environment, PFAS from DECRA's Corona Facilities have contaminated the groundwater and

28    surface water beneath and nearby those facilities, including but not limited to via aerial deposition

- 13 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
100

and stormwater runoff that ultimately migrates to and contaminates Plaintiffs' water supply in the Basin.

53.     Based on information and belief, PFAS-containing DECRA Roofing Products, made prior to 3M's claimed "phase-out" of PFOS and after 3M began using PFBS as a replacement for PFOS, were installed on buildings within or hydrologically upgradient of the Basin. Rainwater that comes into contact with such installed DECRA Roofing Products is likely to include PFAS, and such runoff is captured and diverted as stormwater to various receiving waters and areas that ultimately migrate to and contaminate Plaintiffs' water supply in the Basin.

54.     Based on information and belief, PFAS-containing DECRA Roofing Products, including those made prior to 3M's claimed "phase-out" of PFOS and after 3M began using PFBS as a replacement for PFOS, have been and continue to be disposed in solid waste landfills within or hydrologically upgradient of the Basin. Landfill leachate that is released to groundwater from such solid waste landfills ultimately migrates to and contaminates Plaintiffs' water supply in the Basin.

55.     Due to the well-documented persistence of PFAS in the environment (discussed in more detail below), PFAS released during the manufacture, storage, shipping, and other handling of PFAS-containing DECRA Roofing Products at DECRA's Corona Facilities, through contact with installed DECRA Roofing Products in and around the Basin, or from landfills in and around that Basin are likely to still contaminate the Basin.

56.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the true names and capacities, whether individual, corporate, or otherwise, of DOE Defendants 1 through 100, inclusive, were unknown to Plaintiffs at the time of original filing of the underlying Second Amended Complaint in this action and, therefore sues said Defendants by fictitious names.

57.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the true names or capacities, whether individual, corporate, otherwise, of DOE Defendants 1 through 100, inclusive, remain unknown to Plaintiffs and, therefore Plaintiffs sue said Defendants by such fictitious names. Plaintiffs are informed and believe and based thereon allege

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
101

1   that each of the Defendants designated herein by fictitious names is in some manner legally

2   responsible for the events and happenings herein referred to and caused the damages proximately

3   and foreseeably to Plaintiffs as alleged herein.

4         58.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant

5   times, all of said Defendants herein, including the named Defendants, and DOE Defendants 1

6   through 100, inclusive, are collectively referred herein as "Defendants," "Manufacturing

7   Defendants," and/or Defendant DECRA and all acts and omissions of said Defendants were

8   undertaken by each of the Defendants and said Defendants' agents, servants, employees, and/or

9   owners, acting in the course and scope of its respective agencies, services, employments, and/or

10  ownerships.

11  **JURISDICTION AND VENUE**

12        59.     This Court has jurisdiction over this action pursuant to Code of Civil Procedure

13  sections 187, 1060, 1085, and the California Water Code Appendix 40-1 *et seq.* (the "Orange

14  County Water District Act" or "OCWD Act").

15        60.     Venue is proper in this Court because the Plaintiffs are all located in Orange County

16  and the violations of law alleged herein occurred in Orange County.

17        61.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant

18  times, the Manufacturing Defendants engaged in and were authorized to do business in the state

19  of California.

20        62.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant

21  times, the Manufacturing Defendants have engaged in substantial, continuous economic activity

22  in California, including the business of researching, designing, formulating, handling, disposing,

23  manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or

24  otherwise being responsible for PFOS, PFOA, and PFBS, and/or products that contain PFOS

25  and/or PFOA and/or PFBS, and that said activity by the Manufacturing Defendants is substantially

26  connected to the Plaintiffs' claims as alleged herein.

27        63.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant

28  times, one or more of the Manufacturing Defendants named by Plaintiffs is a California

- 15 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
102

1    corporation incorporated under the laws of the State of California, and/or has its principal place of

2    business in this State, and was an integral part of the business of researching, designing,

3    formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting,

4    marketing, selling, and/or otherwise being responsible for PFOS, PFOA, PFBS, and/or products

5    that contain PFOS and/or PFOA and/or PFBS, and that said activity is substantially connected to

6    the Plaintiffs' claims as alleged herein.

7         64.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant

8    times, one or more of the Defendants named by Plaintiffs are California corporations incorporated

9    under the laws of the State of California, and/or have their principal places of business in this State,

10    and were in the business of researching, designing, formulating, handling, disposing,

11    manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or

12    otherwise being responsible for PFOS, PFOA, PFBS, and/or products that contain PFOS and/or

13    PFOA and/or PFBS, and that said activity is substantially connected to the Plaintiffs' claims as

14    alleged herein.

15         65.    Based on information and belief, the Manufacturing Defendants purposefully

16    affiliated themselves with the forum of the State of California giving rise to the underlying

17    controversy. Such purposeful availment and activities within and related to the State of California

18    are believed to include, but are not limited to, 1) the Manufacturing Defendants' contractual

19    relationships with the entities giving rise to researching, designing, formulating, handling,

20    disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling,

21    and/or otherwise being responsible for PFOS, PFOA, PFBS, and/or products that contain PFOS

22    and/or PFOA and/or PFBS, and that said activity is substantially connected to the Plaintiffs' claims

23    as alleged herein; 2) agreements between the Manufacturing Defendants and entities, institutions

24    and thought leader academics within State of California regarding the PFOS, PFOA, PFBS, and/or

25    products that contain PFOS and/or PFOA and/or PFBS where the Manufacturing Defendants

26    contractually consented to have state courts within the State of California adjudicate disputes; 3)

27    marketing, advertising, selling, and advising third-party sellers of, the PFOS, PFOA, PFBS, and/or

28    products that contain PFOS and/or PFOA and/or PFBS, targeted specifically to consumers and

- 16 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
103

businesses within the State of California; 4) lobbying, consulting, and advisory efforts on behalf of the Manufacturing Defendants with regard to the PFOS, PFOA, PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS stemming from law firms and other agents in the State of California; and 5) and other actions by Defendants targeted to the State of California to be obtained through discovery and other means. As the location from which the Manufacturing Defendants' suit-related conduct arose, California has a substantial vested interest in the acts of the Manufacturing Defendants which led to the underlying controversy.

66.     At all times herein mentioned, the Manufacturing Defendants, and each of them, had actual knowledge that each of the other Defendants was going to intentionally and negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in this Second Amended Complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of care owed by each of the Manufacturing Defendants to Plaintiffs.

## BACKGROUND AND FACTUAL ALLEGATIONS
## THE PFAS COMPOUNDS

67.     OCWD manages the Basin in northern and central Orange County in order to support a variety of beneficial uses, including potable and non-potable water supply. Much of the potable water supply currently used within northern and central Orange County is groundwater pumped from the Basin for use by persons and Producers within OCWD's service area. Such groundwater is transported, reclaimed, purified, treated, injected, extracted, and otherwise managed by OCWD. Because Orange County is located in a semi-arid area, it is essential that all reasonable efforts be put forth by OCWD, in cooperation with the Producers, to protect the quality and quantity of groundwater supplies and to facilitate maximum utilization of local groundwater resources within OCWD's boundaries.

68.     PFAS are a family of chemical compounds containing fluorine and carbon atoms.

69.     PFAS have been prevalently used for decades in industrial settings and in the production of thousands of common household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant.

70.     The PFAS family of chemicals are entirely anthropogenic and do not exist in nature.

- 17 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
104

71.     PFOA, PFOS, and PFBS are PFAS that are known to have characteristics that cause extensive and persistent environmental contamination.

72.     Specifically, PFOA, PFOS, and PFBS are persistent, toxic, and bioaccumulative as well as mobile.

73.     PFOA, PFOS, and PFBS are mobile in that they are soluble and do not easily adsorb (stick) to soil particles.

74.     PFOA, PFOS, and PFBS are readily transported through the air as well as the soil and into groundwater where they can migrate long distances.

75.     PFOA, PFOS, and PFBS are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water or wastewater.

76.     PFOA, PFOS, and PFBS are thermally, chemically, and biologically stable in the environment and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

77.     Once these PFAS compounds are applied, discharged, disposed of, or otherwise released onto land or into the air, soil, sediments, or water, they migrate through the environment and into groundwater and surface water.

78.     These compounds resist natural degradation and are difficult and costly to remove from soil and water.

79.     PFOA, PFOS, and PFBS bioaccumulate, biopersist, and biomagnify in the food web including in people and other organisms.

80.     Exposure to certain PFAS has been associated with several negative health outcomes in both humans and animals, including, but not limited to, the following:

   a.     Altered growth, learning, and behavior of infants and older children;

   b.     Lowering a woman's chance of getting pregnant;

   c.     Interference with the body's natural hormones;

   d.     Increased cholesterol levels;

   e.     Modulation of the immune system;

- 18 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
105

f.  Increased risk of certain cancers; and

g.  Increased risk of ulcerative colitis.

81.  Contamination from PFOS and/or PFOA and/or PFBS presents a threat to public health and the environment.

82.  In addition to drinking contaminated water, humans can be exposed to PFOA, PFOS, and PFBS through inhalation, ingestion of contaminated food, and dermal contact.

83.  PFOA, PFOS, and PFBS enter the environment from industrial facilities that use PFAS in the manufacture or production of other products.

84.  Releases to land, air, and water from industrial sites are known pathways to the environment.

85.  PFOA, PFOS, and PFBS may also enter the environment from wastewater treatment facilities and also when released from PFAS-containing consumer and commercial products during their use and after they have been disposed to landfills or in any other manner.

86.  PFOA, PFOS, and PFBS may also enter the environment when released from PFAS-containing consumer and commercial products during their use, and after they have been disposed.

87.  On information and belief, ordinary stormwater flows transport PFAS that have been released into the environment from these various pathways of contamination to surface and groundwater in and around the Basin, including from discharge to wastewater, disposal to landfills, and other avenues of disposal in any other manner.

88.  The California State Water Resources Control Board has concluded that, among the "major sources of PFAS" are: industrial sites, landfills, and wastewater treatment plants/biosolids. It elaborates: "PFAS can get into drinking water when products containing them are used or spilled onto the ground or into lakes and rivers. Once in groundwater, PFAS are easily transported large distances and can contaminate drinking wells. PFAS in the air can also end up in rivers and lakes used for drinking water."

(https://www.waterboards.ca.gov/pfas/background.html#collapseFour) (last accessed Feb. 1, 2021).

- 19 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
106

89.     For example, the State Water Resources Control Board has investigated landfills as potential sources of PFAS contamination, concluding that "investigation is necessary at and around landfills statewide to determine the presence of PFAS, their respective levels in leachate and groundwater, and to evaluate the impact of current and historic discharges from these facilities on groundwater quality," clearly indicating that within California, PFAS contamination is of concern near landfills, prompting the State to sample the same.[2]

90.     In the same way that PFAS are released from consumer products through their disposal in landfills, PFAS are also released from consumer products directly into the wastewater stream, e.g., by laundering PFAS-coated clothing, through use of PFAS-containing home care products, like Scotchgard®, Stainmaster®, Polartec®, and Gore-tex® fabric coatings and cleaners, and through use of PFAS-containing cook wear, including Teflon®.

91.     Also, on information and belief, the Manufacturing Defendants, sold PFAS and/or PFAS-containing products to companies with California locations that Manufacturing Defendants knew or should have known would be used and/or disposed of in California.

92.     3M and Old DuPont branded products are sold throughout the United States and inside California based on nationwide marketing campaigns.

93.     Old DuPont (and later Chemours) branded intermediate products, including (for example) coating products are sold to and applied within Orange County at several different businesses, which coatings would have been applied at and pursuant to Old DuPont's (and later Chemours') instruction and, on information and belief, with training from Old DuPont (and later Chemours).

94.     As discussed further below, both 3M and Old DuPont have operations in California. (https://www.dupont.com/locations.html#North%20America, identifying a Torrance location); https://www.dupont.com/locations/palo-alto-california-dupont-research-development-center.html, identifying a Palo Alto location; https://www.corteva.com/resources/media-

---

[2] https://www.waterboards.ca.gov/pfas/docs/landfill_pfas_13267_go_03202019.pdf (last accessed Feb. 2, 2021).

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
107

center/bay-area-innovation-center-strengthens-rnd-presence.html, identifying a Hayward location). DuPont engages in a research collaboration in California with the California Life Sciences Institute: http://califescienceinstitute.org/dupont-industrial-biosciences-2/.

95.    This includes retail sales of products resulting from Manufacturing Defendants' intentional marketing activities aimed at California markets as well as Manufacturing Defendants' sales to third parties who ultimately incorporated PFAS compounds into a finished product, which the Manufacturing Defendants knew or should have known would be used and/or disposed of in California.

96.    In each of these circumstances, Manufacturing Defendants have directed PFAS or PFAS-containing products and intermediates to California consumers or businesses for consumption and disposal in California.

97.    All the while, the Manufacturing Defendants have known of health and environmental risks associated with PFAS compounds for decades but concealed that knowledge until it was exposed through litigation and regulatory action in relatively recent years.

98.    The Manufacturing Defendants' manufacture, distribution and/or sale of PFOS and/or PFOA and/or PFBR and/or products containing PFOA and/or PFOS and/or PFBS resulted in the release of PFOS and/or PFOA and/or PFBS into the environment.

99.    Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, the Manufacturer Defendants knew, foresaw, and/or should have known and/or foreseen that PFOS and/or PFOA and/or PFBS would contaminate the environment.

100.    The Manufacturing Defendants knew, foresaw, and/or should have known and/or foreseen that their marketing, promotion, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use of PFOS and/or PFOA and/or PFBS containing materials, including in California, would result in the contamination of the groundwater that is the primary source of water supply for Plaintiffs' public water systems.

101.    The Manufacturing Defendants' products were unreasonably and inherently dangerous and the Manufacturing Defendants failed to warn of this danger.

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
108

**3M COMPANY'S MANUFACTURE AND DISTRIBUTION OF PFAS**

102.   For most of the past seven decades through the early 2000s, 3M was the primary manufacturer of PFAS in the United States.

103.   3M is the only known manufacturer of PFOS in the United States.

104.   3M began producing PFOA and PFOS as raw materials or ingredients that it used to produce other products, or that it sold to third parties for use in other products.

105.   3M produced PFAS by electrochemical fluorination ("ECF") beginning in the 1940s.

106.   ECF results in a product that contains and/or breaks down into compounds containing PFOS and/or PFOA.

107.   3M went on to market and promote PFAS and shipped PFAS to manufacturers, including Old DuPont, throughout the United States, including California. 3M made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to California as well as throughout the country for decades until announcing in 2000 that it would cease production of PFOA and PFOS (described in more detail below).

108.   On information and belief, when 3M phased out PFOS, it began using PFBS in its place.

**OLD DUPONT'S USE AND MANUFACTURE OF PFOA**

109.   Beginning in 1951, Old DuPont began purchasing PFOA from 3M for use in the manufacturing process for Old DuPont's name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

110.   Old DuPont has also used PFAS in other name-brand products such as Stainmaster®.

111.   Although Old DuPont was fully aware that PFOA was an inherently dangerous and toxic chemical for decades, it produced its own PFAS compounds for use in its manufacturing processes, including the initiation of PFOA production as 3M phased out production of PFOA.

112.   Old DuPont marketed and promoted PFAS, and it shipped PFAS to manufacturers throughout the United States, including California. Old DuPont made enormous profits from PFAS

- 22 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
109

1    and products containing PFAS and shipped PFAS and products containing PFAS to California as

2    well as throughout the country for decades, including with PFOA, which Old DuPont publicly

3    claimed to have stopped manufacturing in 2013.

4                              **3M'S KNOWLEDGE OF THE DANGERS OF PFAS**

5           113.    In the 1950s, based on its own internal studies, 3M concluded that PFAS are

6    "toxic."

7           114.    3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and

8    animals.

9           115.    By the early 1960s, 3M understood that some PFAS are highly persistent in the

10   environment, meaning that they do not degrade.

11          116.    3M knew as early as 1960 that chemical wastes from its PFAS manufacturing

12   facilities that were dumped to landfills would leach into groundwater and otherwise enter the

13   environment. A 3M internal memo from 1960 described the company's understanding that such

14   wastes "[would] eventually reach the water table and pollute domestic wells."

15          117.    As early as 1963, 3M was aware that its PFAS products were persistent in the

16   environment and would not degrade after disposal.

17          118.    3M began monitoring the blood of its employees for PFAS, as early as 1976,

18   because 3M was concerned about health effects of PFAS.

19          119.    3M documents from 1977 relating to these worker tests further confirm that PFAS

20   bioaccumulate.

21          120.    By at least 1970, 3M knew that its PFAS products were hazardous to marine life.

22          121.    One study of 3M's PFAS around this time had to be abandoned to avoid severe

23   local pollution of nearby surface waters.

24          122.    In 1975, 3M found there was a "universal presence" of at least one form of PFAS

25   in blood serum samples taken from across the United States.

26          123.    Because PFAS are not naturally occurring in any amount, anywhere on the planet,

27   this finding unquestionably alerted 3M to the near inevitability that its products were a pathway

28   for widespread public exposure to its toxic ingredient—a likelihood that 3M considered internally

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
110

1    but did not share outside the company.

2    124.    This finding also alerted 3M to the likelihood that this PFAS is mobile, persistent,

3    bioaccumulative, and biomagnifying, as those characteristics would explain the ubiquitous

4    presence of this PFAS from 3M's products in human blood.

5    125.    According to a deposition transcript in a lawsuit brought by the State of Minnesota

6    against 3M (No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)) ("Minn. Lawsuit") for

7    damages to the state's natural resources from PFAS, 3M began monitoring the blood of its

8    employees for PFAS, as early as 1976, because the company was "concerned" about "health"

9    effects of PFAS. 3M documents from 1977 relating to these worker tests further confirmed that

10   PFAS bioaccumulate.

11   126.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

12   127.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the

13   environment, including in surface water and biota.

14   128.    A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama

15   plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River.

16   129.    3M resisted calls from its own ecotoxicologists going back to 1979 to perform an

17   ecological risk assessment on PFOS and similar chemicals.

18   130.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

19   131.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate

20   questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the

21   environment."

22   132.    In 1984, 3M's internal analyses demonstrated that PFAS were likely

23   bioaccumulating in 3M fluorochemical employees.

24   133.    According to the Minnesota Attorney General, despite 3M's understanding of the

25   risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning

26   PFAS and to suppress research into the potential harms associated with PFAS.

27   134.    According to a deposition transcript from the Minn. Lawsuit, 3M recognized that

28   if the public and governmental regulators became aware of the risks associated with PFAS, 3M

- 24 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
111

1   would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result

2   in the loss of hundreds of millions of dollars in annual revenue.

3   135.   The potential loss of 3M's massive profits from PFAS drove 3M to engage in a

4   campaign to influence the science relating to PFAS and, according to internal 3M documents, to

5   conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

6   136.   A key priority of an internal 3M committee—referred to as the FC Core Team—

7   was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and

8   ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research

9   through 3M 'grant' money."

10   137.   In exchange for providing grant money to friendly researchers, 3M obtained the

11   right to review and edit draft scientific papers regarding PFAS and sought control over when and

12   whether the results of scientific studies were published at all.

13   138.   A significant aspect of 3M's campaign to influence independent scientific research

14   involved 3M's relationship with Professor John Giesy. 3M provided millions of dollars in grants

15   to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his

16   deposition transcript in the Minn. Lawsuit, he privately characterized himself as part of the 3M

17   "team."

18   139.   According to Professor Giesy's deposition transcript in the Minn. Lawsuit,

19   Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose

20   of entering into a "quid pro quo" with the scientists.

21   140.   According to emails produced by Professor Giesy in the Minn. Lawsuit, through

22   his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers

23   published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles

24   and, in performing reviews of these articles, Professor Giesy stated that he was always careful to

25   ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding

26   PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle

27   to refute."

28   141.   According to Professor Giesy's deposition transcript in the Minn. Lawsuit, despite

- 25 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
112

spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General, in part, a direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

142.     3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

143.     In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOS products in 2000.

144.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

145.     On the same day as 3M's phase-out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

146.     In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

147.     3M knew or should have known that through their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in California.

**OLD DUPONT'S KNOWLEDGE OF THE DANGERS
OF PFAS AND MOUNTING LIABILITIES**

148.     Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities in the United States.

149.     Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and biopersistent in the environment. Old DuPont also knew

- 26 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
113

1    that it directly emitted and discharged, and continued to emit and discharge, PFOA in large

2    quantities into the environment from its manufacturing plants, such that hundreds of thousands of

3    people had been exposed to its PFOA, including through public and private drinking water supplies.

4           150.    Old DuPont company scientists issued internal warnings about the toxicity

5    associated with their PFOA products as early as 1961.

6           151.    Old DuPont's Toxicology Section Chief opined that such products should be

7    "handled with extreme care," and that contact with the skin should be "strictly avoided."

8           152.    In 1978, based on information it received from 3M about elevated and persistent

9    organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and

10    monitor the health conditions of potentially exposed workers in order to assess whether any

11    negative health effects could be attributed to PFOA exposure.

12           153.    This monitoring plan involved obtaining blood samples from the workers and

13    analyzing them for the presence of organic fluorine.

14           154.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a

15    significantly higher incidence of health issues than did unexposed workers.

16           155.    Old DuPont did not report this data or the results of its worker health analysis to

17    any government agency or community.

18           156.    The following year, Old DuPont internally confirmed that PFOA "is toxic," that

19    humans bioaccumulate PFOA in their tissue, and that "continued exposure is not tolerable."

20           157.    Not only did Old DuPont know that PFOA bioaccumulates in humans, but it was

21    also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

22           158.    In fact, Old DuPont had reported in March 1982 that results from a rat study showed

23    PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of

24    internal studies of its own plant workers confirming placental transfer of PFOA in humans.

25           159.    While Old DuPont knew about this toxicity danger as early as the 1960s, Old

26    DuPont also was aware that PFAS was capable of contaminating the surrounding environment and

27    causing human exposure.

28           160.    By at least 1981, Old DuPont also knew that PFOA could be emitted into the air

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
114

1    from its facilities, and that those air emissions could travel beyond the facility boundaries and enter

2    the environment and natural resources.

3         161.   By 1984, Old DuPont unquestionably was aware that PFOA is biopersistent.

4         162.   Old DuPont was long aware that the PFAS it was releasing from its facilities was

5    leaching into groundwater used for public drinking water.

6         163.   After obtaining data on these releases and the resulting contamination near Old

7    DuPont's Washington Works plant in West Virginia in 1984, Old DuPont held a meeting at its

8    corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues

9    related to PFOA (the "1984 Meeting").

10        164.   Old DuPont employees who attended the 1984 Meeting discussed available

11   technologies that were capable of controlling and reducing PFOA releases from its manufacturing

12   facilities, as well as potential replacement materials.

13        165.   Old DuPont chose not to use either available technologies or replacement materials,

14   despite knowing of PFOA's toxicity.

15        166.   During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA

16   issue as "one of corporate image, and corporate liability."

17        167.   They were resigned to Old DuPont's "incremental liability from this point on if we

18   do nothing" because Old DuPont was "already liable for the past 32 years of operation."

19        168.   They also stated that the "legal and medical [departments within Old DuPont] will

20   likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these

21   departments had "no incentive to take any other position."

22        169.   By 2000, Old DuPont's in-house counsel was particularly concerned about the

23   threat of punitive damages resulting from Old DuPont's releases of PFOA at its Washington Works

24   facility in West Virginia.

25        170.   Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised

26   concerns about Old DuPont's statements to the public that there were no adverse health effects

27   associated with human exposure to PFOA.

28        171.   For example, in February 2006, the ERB "strongly advise[d] against any public

- 28 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
115

statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

172.    In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of federal environmental laws.

173.    In 2005, Old DuPont eventually settled the action by agreeing to pay $10.25 million in a civil administrative penalty and to complete $6.25 million in supplemental environmental projects.

174.    Old DuPont also promised to phase out production and use of PFOA by 2015.

175.    EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

176.    Old DuPont and Chemours knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in California.

177.    Also, in 2005, a final court order was entered approving Old DuPont's 2004 settlement in the class action lawsuit styled *Leach, et al. v. E.I. du Pont de Nemours & Co.*, Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "Leach Action") filed on behalf of approximately 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia for benefits valued at over $300 million.

178.    Under the terms of the final class action settlement, Old DuPont agreed to fund a panel of independent scientists (the "C8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. "C-8," a term used internally by DuPont employees, is an alternative name for PFOA.

179.    After seven years of study and analyses, the C8 Science Panel confirmed that PFOA exposures among class members were linked to several serious human diseases, including two types of cancer.

- 29 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
116

180. More than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia following the final settlement in the *Leach* Action and the findings of the C8 Science Panel.

181. These claims were consolidated in the federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio (the "C8 MDL").

182. Between 2015 and 2016, juries in three bellwether trials in the C8 MDL returned multi-million-dollar verdicts against Old DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their cancers.

183. As discussed below, Old DuPont required that Chemours both directly assume its historical PFAS liabilities, and also indemnify Old DuPont from those liabilities. Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [C8] MDL could have a material adverse effect on Chemours' consolidated financial position, results of operations or liquidity."

184. On February 13, 2017, Old DuPont and Chemours agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the C8 MDL.

**OLD DUPONT'S MULTI-STEP, FRAUDULENT SCHEME TO ISOLATE ITS VALUABLE TANGIBLE ASSETS FROM ITS PFAS LIABILITIES AND HINDER CREDITORS**

185. By 2013, Old DuPont knew that it faced substantial environmental and other liabilities arising from its use of PFOA at Washington Works alone, as well as liability related to PFAS contamination at other sites and areas throughout the country, and that its liability was likely billions of dollars.

186. These liabilities include clean-up costs, remediation obligations, tort damages, natural resource damages and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

187. In light of this significant exposure, upon information and belief, by 2013 Old DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm and personal injuries that Old

- 30 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
117

1  DuPont's PFAS and associated conduct caused, and to shield billions of dollars in assets from

2  these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

3  188.   Upon information and belief, Old DuPont contemplated various restructuring

4  opportunities, including potential merger structures. In or about 2013, Old DuPont and Old Dow

5  began discussions about a possible "merger of equals."

6  189.   Upon information and belief, Old DuPont recognized that neither Old Dow, nor

7  any other rational merger partner, would agree to a transaction that would result in exposing Old

8  Dow, or any other merger partner, to the substantial PFAS liabilities that Old DuPont faced.

9  190.   Accordingly, Old DuPont's management decided to pursue a corporate

10  restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from

11  its valuable tangible assets in order to shield those assets from creditors and entice Old Dow to

12  pursue the proposed merger.

13  191.   Old DuPont engaged in a three-part restructuring plan, further explained below.

14  192.   The first step in Old DuPont's plan was to transfer its Performance Chemicals

15  business (which included Teflon® and other products, the manufacture of which involved the use

16  of PFOA and other PFAS) into its wholly-owned subsidiary, Chemours. And then, in July 2015,

17  Old DuPont "spun-off" Chemours as a separate publicly-traded entity and saddled Chemours with

18  Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

19  193.   Old DuPont knew that Chemours was undercapitalized and could not satisfy the

20  massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours

21  Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still

22  faced direct liability for its own conduct.

23  194.   Accordingly, Old DuPont moved on to the next step of its plan, designed to further

24  distance itself from the exposure it had created over its decades of illicit and illegal conduct with

25  regard to PFAS.

26  195.   The second step involved Old DuPont and Old Dow entering into an "Agreement

27  and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with

28  subsidiaries of a newly-formed holding company, DowDuPont, Inc. ("DowDuPont"), which was

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
118

created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

196. Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

197. The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

198. The third step involved DowDuPont spinning off two, new, publicly-traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow as a subsidiary. DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

199. As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

200. New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

201. Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Upon information and belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like Plaintiffs, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

**STEP 1: THE CHEMOURS SPINOFF**

202. In February 2014, Old DuPont formed Chemours as a wholly-owned subsidiary. Chemours was originally incorporated on February 18, 2014, under the name "Performance Operations, LLC."

203. On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

204. Prior to July 1, 2015, Chemours was a wholly-owned subsidiary of Old DuPont.

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
119

On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals business, and Chemours became a separate, publicly-traded entity (the "Chemours Spinoff").

205.    At the time of the spinoff, the Performance Chemicals business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluorochemicals segments (the "Performance Chemicals Business").

206.    The Performance Chemicals Business included the fluoroproducts and chemical solutions businesses that had manufactured, used, and discharged PFOA into the environment.

207.    Prior to the Chemours Spinoff, Chemours was a wholly-owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

208.    On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

209.    On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

210.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

211.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

212.    Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all of the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

213.    At the same time, Chemours accepted a broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Chemours assumed are set forth in non-public schedules and exhibits to the Chemours Separation

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
120

1   Agreement.

2        214.    Notwithstanding the billions of dollars in PFAS liabilities that Chemours would

3   face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash

4   dividend, along with a "distribution in kind" of promissory notes with an aggregate principal

5   amount of $507 million.

6        215.    Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Chemours funded

7   these distributions by entering into approximately $3.995 billion of financing transactions,

8   including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours

9   distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1,

10  2015 (181 million shares at $16.51 per share price).

11       216.    Accordingly, most of the valuable assets that Chemours may have had at the time

12  of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and

13  Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours

14  transferred almost $7 billion in stock, cash, and notes to Old DuPont and its shareholders. Old

15  DuPont, however, only transferred $4.1 billion in net assets to Chemours. And, Chemours assumed

16  billions of dollars of Old DuPont's PFAS and other liabilities.

17       217.    In addition to the assumption of such liabilities, the Chemours Separation

18  Agreement required Chemours to provide broad indemnification to Old DuPont in connection with

19  these liabilities, which is uncapped and does not have a survival period.

20       218.    The Chemours Separation Agreement requires Chemours to indemnify Old DuPont

21  against, and assume for itself, all "Chemours Liabilities," which is defined broadly to include,

22  among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or

23  resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any

24  time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed

25  Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and

26  arising from its decades of emitting PFOA into the environment from Washington Works and

27  elsewhere.

28       219.    The Chemours Separation Agreement also requires Chemours to indemnify Old

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
121

DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

220.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

221.    Chemours also agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

222.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS liabilities were properly estimated and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

223.    There was no meaningful, arms-length negotiation of the Separation Agreement.

224.    In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

225.    Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed,

Chemours was a wholly-owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

226.    Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

227.    It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

228.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

229.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

230.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding total net worth of $130 million.

231.    Removing Chemours' goodwill and other intangibles of $176 million yields tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets). According to unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

232.    Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours also had $553 million in "other liabilities," which included

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
123

$223 million for environmental remediation and $58 million for accrued litigation.

233.   Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be tens of billions of dollars.

234.   Had Chemours taken the full extent of Old DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

**STEP 2: THE OLD DOW/OLD DUPONT "MERGER"**

235.   After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

236.   Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

237.   Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

238.   On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

239.   To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement

- 37 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
124

and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., *i.e.*, "New DuPont" and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

240.   Upon the closing of the DowDuPont Merger, Old Dow merged into one merger subsidiary, and Old DuPont merged into the other merger subsidiary. Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly-owned subsidiaries of DowDuPont.

241.   Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (*i.e.*, New DuPont).

242.   The below image reflects the corporate organization following the "merger":



**STEP 3: THE SHUFFLING, REORGANIZATION, AND TRANSFER OF VALUABLE ASSETS AWAY FROM OLD DUPONT AND SEPARATION OF CORTEVA AND NEW DOW**

243.   Following the Dow-DuPont Merger, DowDuPont (*i.e.*, New DuPont) underwent a significant internal reorganization, and engaged in numerous business segment and product line

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
125

1   "realignments" and "divestitures." The net effect of these transactions has been the transfer, either

2   directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

3        244.    While, again, the details of these transactions remain hidden from the Plaintiffs and

4   other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors

5   with claims against Old DuPont, including with respect to its substantial PFAS liabilities. The

6   significant internal reorganization instituted by DowDuPont (*i.e.*, New DuPont) was in preparation

7   for the conglomerate being split into three, separate, publicly-traded companies.

8        245.    Old DuPont's assets, including its remaining business segments and product lines,

9   were transferred either directly or indirectly to DowDuPont (*i.e.*, New DuPont), which reshuffled

10  the assets and combined them with the assets of Old Dow, and then reorganized the combined

11  assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products

12  Business"; and (iii) the "Material Sciences Business."

13       246.    While the precise composition of these divisions, including many details of the

14  specific transactions, the transfer of business segments, and the divestiture of product lines during

15  this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion

16  of its valuable assets to DowDuPont (*i.e.*, New DuPont), for far less than the assets were worth.

17       247.    Once the assets of Old DuPont and Old Dow were combined and reorganized,

18  DowDuPont (*i.e.*, New DuPont) incorporated two new companies to hold two of the three newly

19  formed business lines: (i) Corteva, which became the parent holding company of Old DuPont,

20  which in turn holds the Agriculture Business; and (ii) New Dow, which became the parent holding

21  company of Old Dow, and which holds the Materials Science Business. DowDuPont (*i.e.*, New

22  DuPont) retained the Specialty Products Business, and prepared to spin off Corteva and New Dow

23  into separate, publicly-traded companies.

24

25

26

27

28

- 39 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
126

248.    The below graph depicts the structure of DowDuPont after the internal reorganization and realignment:



249.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow and DowDuPont (*i.e.*, New DuPont) (the "DowDuPont Separation Agreement").

250.    The Dow DuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business) and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

251.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*, (i) Corteva retained and assumed the liabilities related to the Agriculture Business; (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

252.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that

- 40 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
127

was not related to the Agriculture, Material Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

253.   This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals business, including Plaintiffs' claims in this case.

254.   While New DuPont and Corteva have buried the details in non-public schedules, upon information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Plaintiff can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of the groundwater and surface water within the OCWD and the Producers' public water systems.

255.   The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (*i.e.*, New DuPont) distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

256.   On or about May 2, 2019, DowDuPont (*i.e.*, New DuPont) consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont (i.e., New DuPont) spun off Corteva as an independent public company.

257.   Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now also trades on the NYSE under the stock ticker "CTVA."

258.   The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont (*i.e.*, New DuPont) stockholders as a pro rata dividend.

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
128

259.    The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below:



260.    Also, on or about June 1, 2019, DowDuPont changed its registered name to Du Pont de Nemours Inc. (*i.e.*, New DuPont).

**THE EFFECT OF THE YEARS-LONG SCHEME TO DEFRAUD PLAINTIFFS AND OTHER CREDITORS AND AVOID FINANCIAL RESPONSIBILITY FOR LEGACY LIABILITIES**

261.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont, and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

262.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

- 42 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
129

263.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

264.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

265.    Additionally, Old DuPont reported a significant decrease in Income From Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

266.    The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

267.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

268.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

269.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

270.    Old DuPont's financial condition has continued to deteriorate. By end of fiscal year 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are

- 43 -

1    intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

2        271.    Old DuPont's tangible net worth between September 30, 2019 and December 31,

3    2019 declined even further, whereby Old DuPont ended fiscal year 2019 with tangible net worth

4    of negative $1.125 billion.

5        272.    In addition, Plaintiffs cannot take comfort in the "allocation" of liabilities to New

6    DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old

7    DuPont's historical PFAS liabilities. And it is far from clear that either entity will be able to satisfy

8    any judgment in this case.

9        273.    Indeed, New DuPont—to which 71% of PFAS liabilities are "allocated" under the

10   DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of

11   divesting numerous business segments and product lines, including tangible assets that it received

12   from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

13       274.    New DuPont has received or will receive significant proceeds on the sales of Old

14   DuPont's former business segments and product lines.

15       275.    In September 2019, New DuPont sold the Sustainable Solutions business for $28

16   million to Gyrus Capital.

17       276.    On or about December 15, 2019, New DuPont agreed to sell the Nutrition and

18   Biosciences business to International Flavors & Fragrances for $26.2 billion.

19       277.    In March 2020, New DuPont completed the sale of Compound Semiconductor

20   Solutions for $450 million to SK Siltron.

21       278.    In addition, New DuPont has issued Notices of Intent to Sell relating to six non-

22   core segments (estimated by market analysts at approximately $4.5 billion), as well as the

23   Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019

24   of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and

25   amortization of $1.3 billion.

26       279.    Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities

27   are "allocated" under the DowDuPont Separation Agreement once certain conditions are

28   satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly-owned

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
131

subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

**MANUFACTURING DEFENDANTS' LIABILITY**

280.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, despite such knowledge, Defendants, and each of them, acting through their officers, directors, and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in the Manufacturing Defendants' products and failed to warn the public, including Plaintiffs, that the subject products were inherently dangerous, and that there was an extreme risk of injury and harm occasioned by the inherently dangerous nature of the products and defects inherent in the products. Manufacturing Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution, and marketing of the subject products knowing that the public, including Plaintiffs, would be exposed to harm and serious danger in order to advance Defendants' own pecuniary interest and monetary profits.

281.    Plaintiffs are informed and believe and therefore allege that, at all relevant times alleged herein, the Manufacturing Defendants' conduct was despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by the Manufacturing Defendants with willful and conscious disregard for safety, entitling Plaintiffs to exemplary damages under California Civil Code section 3294.

**3M AND DEFENDANT DECRA CORONA FACILITIES**

282.    As noted in Paragraph 6 above, 3M owns and operates the 3M Corona Facility, which occupies approximately 1,300 acres of land in the Temescal Canyon. According to its website, 3M acquired the Corona site from the Blue Diamond Company in 1941. 3M began manufacturing at that site in 1948.

283.    3M's business operations are comprised of four primary business groups: Safety and Industrial, Transportation and Electronics, Health Care, and Consumer. The 3M Corona Facility is part of 3M's Industrial Mineral Products Division, which is within the Safety and Industry business group.

- 45 -

284.    The 3M Corona Facility's primary products are colored and specialty ceramic roofing granules for the asphalt shingle industry ("3M Corona Products"). 3M produces significant volumes of these products at the 3M Corona Facility. For example, in 2011 alone, more than 414 million pounds of these materials were manufactured at this site.

285.    3M currently uses or in the past has used PFAS in the manufacturing of roofing materials and holds several roofing-material patents that incorporate PFAS into the manufacturing process.

286.    Downgradient from the 3M Corona Facility, surface water and groundwater are contaminated with high levels of PFAS, including PFOS and PFOA.

287.    Upgradient from the plant, the PFAS concentrations are lower or non-detect.

288.    The below images depict the Temescal Creek corridor along which the 3M Corona Facility and DECRA Corona Facilities sit. Temescal Creek flows roughly southeast to northwest as depicted in these images, so "upgradient" of the 3M Corona Facility would be the area depicted outside of the images, below the 3M Corona Facility.



- 46 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
133



289.    At all relevant times, 3M failed and/or refused to report, investigate, control, and/or remediate PFAS disposed of, or otherwise released from, 3M's Corona Facility. As a direct and proximate result thereof, Plaintiffs have suffered damages including but not limited to the following:

A.    Water from the Santa Ana River used for groundwater recharge has become contaminated with PFOA, PFOS, and PFBS;

B.    The Santa Ana River has become contaminated with PFOA, PFOS, and PFBS;

C.    Other surface water and groundwater resources within the Basin have become contaminated with PFOA, PFOS, and PFBS;

D.    Water that has recharged the aquifers within the Basin has become contaminated with PFOA, PFOS, and PFBS as recharged water has mixed with contaminated groundwater; and

E.    The Producers' drinking water supply wells have become contaminated with PFOA, PFOS, and PFBS.

290.    Despite awareness of the high levels of contamination, 3M failed to determine the

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
134

1   extent of the contamination and did not adequately remediate the offsite migration to prevent

2   contamination of drinking water wells or protect human health. 3M and its managing agents have

3   failed and refused to act to prevent contamination of surface water, groundwater, and drinking

4   water supplies with full knowledge that failure to do so would cause contamination of drinking

5   water supplies and property damage.

6        291.   Upon information and belief Defendant DECRA maintains a manufacturing facility

7   at 1230 Railroad Street, Corona, California 92882 and a warehousing, shipping, and receiving

8   facility at an adjacent property at 235 N. Sherman Avenue, Corona, California 92882. Upon

9   information and belief Defendant DECRA purchases specialty roofing granules from the 3M

10   Corona Facility and then manufactures those 3M specialty roofing granules, which include PFAS

11   ingredients, into its DECRA Roofing Products that are warehoused at, then shipped from

12   Defendant DECRA's Corona, California facilities to customers throughout Plaintiffs' respective

13   service areas. On information and belief, Defendant DECRA's manufacture and storage of PFAS-

14   containing roofing materials at the DECRA Corona Facilities has caused or contributed to

15   contamination of the Basin as well as the Plaintiffs' contaminated wells and the groundwaters and

16   aquifer that supply them with PFOA and PFOS, resulting in the damages alleged in this Second

17   Amended Complaint.

**FIRST CAUSE OF ACTION**
**Strict Product Liability Based on Defective Design**
**(By all Plaintiffs against Manufacturing Defendants)**

20        292.   Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

21   this Second Amended Complaint as if fully set forth herein.

22        293.   The Manufacturing Defendants were engaged in the business of researching,

23   designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing,

24   promoting, marketing, selling, and/or otherwise responsible for PFOA, PFOS, PFBS, and/or

25   products that contain PFOA and/or PFOS and/or PFBS, resulting in contamination of the

26   environment, including the groundwater within OCWD's territorial jurisdiction and that serves as

27   a water source for OCWD, the Producers, and their customers, thereby causing damage to

28   Plaintiffs.

- 48 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
135

294.    The Manufacturing Defendants' PFAS products were defective in design and formulation when they left the hands of the Manufacturing Defendants.

295.    When used in a foreseeable manner, the Manufacturing Defendants' products resulted in the spillage, leaching, discharge, disposal, and/or release of PFOA and/or PFOS and/or PFBS resulting in contamination of surface water and groundwater.

296.    At all times relevant to this action, the Manufacturing Defendants' PFOA and/or PFOS and/or PFBS and products that contain PFOA and/or PFOS and/or PFBS were defective and inherently dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the benefit of the presence of PFOA, PFOS, and PFBS, if any, did not outweigh the risk of harm to public health and welfare and the environment posed by the presence of PFOA, PFOS, and PFBS.

297.    As a result of the Manufacturing Defendants' products, Plaintiffs have incurred, are incurring, and/or will continue to incur investigation, sampling, remediation, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the contamination of the surface water, groundwater, replenishment water, drinking water supply and the Plaintiffs' contaminated wells.

298.    As a direct and proximate result of the defects previously described, the surface water and groundwater within OCWD's territorial jurisdiction, including groundwater that serves as the source of water to the contaminated wells and surface water that serves as the source of replenishment water for the Basin, is and will continue to be, contaminated with PFOA and/or PFOS and/or PFBS, causing damage to such groundwaters and causing Plaintiffs significant injury and property damage. Restoration, repair, and/or remediation of the property damage alleged herein has required Plaintiffs, and will continue to require Plaintiffs, to incur substantial costs and expenses in an amount to be proved at trial.

299.    The Manufacturing Defendants, when researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFOS and/or PFOA and/or PFBS and/or products containing PFOS and/or PFOA and/or PFBS, anticipated and should have accounted for the

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
136

1   foreseeable risks posed by their PFAS products.

2         300.   The Manufacturing Defendants are strictly, jointly, and severally liable for the

3   damages described in this Second Amended Complaint.

4         301.   The Manufacturing Defendants knew and/or should have known that it was

5   substantially certain that their alleged acts and omissions described in this Second Amended

6   Complaint would cause injury and damage, including contamination of surface water and

7   groundwater within OCWD's territorial jurisdiction and the Producers' public water systems with

8   PFOA, PFOS, and/or PFBS. The Manufacturing Defendants committed each of the above-

9   described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such

10   conduct was performed to promote sales of PFOA, PFOS, PFBS, and/or products that contain

11   PFOA and/or PFOS and/or PFBS and maximize profits, in conscious disregard of the probable

12   dangerous consequences of that conduct and its foreseeable impact upon health, property and the

13   environment, including the surface water, groundwater, replenishment water, drinking water

14   supply and the Plaintiffs' contaminated wells. Therefore, Plaintiffs also request an award of

15   exemplary damages in an amount that is sufficient to punish these Manufacturing Defendants and

16   that fairly reflects the aggravating circumstances alleged herein.

17   **SECOND CAUSE OF ACTION**
**Strict Products Liability Based on Defective Design**
18   **(By all Plaintiffs against 3M and Defendant DECRA)**

19         302.   Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

20   this Second Amended Complaint as if fully set forth herein.

21         303.   3M's manufacturing activities at the Corona Facility since approximately the 1940s

22   give rise to its liability in this cause of action.

23         304.   Based on information and belief, 3M's Corona Products have contained and/or do

24   contain PFOS and/or PFOA and/or PFBS, during the time between the 1940s and today.

25         305.   3M's researching, designing, formulating, handling, disposing, manufacturing,

26   labeling, using, testing, distributing, promoting, marketing, and selling 3M Corona Products that

27   contain PFOA and/or PFOS and/or PFBS resulted in contamination of the environment, including

28   the groundwater within OCWD's territorial jurisdiction and that serves as a water source for

- 50 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
137

1    OCWD, the Producers, and their customers, thereby causing damage to Plaintiffs.

2         306.    3M's Corona Products were defective in design and formulation when they left

3    3M's hands.

4         307.    Based on information and belief, Defendant DECRA has an exclusive relationship

5    with 3M for purchase of roofing granules manufactured by 3M that on information and belief

6    contain PFOS and/or PFOA and/or PFBS, which DECRA incorporates into its own products,

7    warehouses them, and then ships its products throughout Plaintiffs' service areas, making DECRA

8    strictly liable as a member of the manufacturing chain of these defective products.

9         308.    When used in a foreseeable manner, 3M's Corona Products and DECRA's Roofing

10   Products resulted in the spillage, leaching, discharge, disposal, and/or release of PFOA and/or

11   PFOS and/or PFBS resulting in contamination of surface water and groundwater.

12        309.    At all times relevant to this action, 3M and DECRA's PFAS-containing Corona

13   Products and Roofing Products were defective and inherently dangerous to an extent beyond which

14   would be contemplated by the ordinary consumer, and/or benefit of the presence of PFOA and

15   PFOS, if any, did not outweigh the risk of harm to the public health and welfare and the

16   environment posed by the presence of PFOA, PFOS, and/or PFBS.

17        310.    As a result of the 3M's Corona Products and DECRA's Roofing Products

18   containing PFOA and/or PFOS and/or PFBS, Plaintiffs have incurred, are incurring, and/or will

19   continue to incur investigation, sampling, remediation, treatment system design, acquisition,

20   installation, operations and maintenance, and other costs and damages related to the contamination

21   of the surface water, groundwater, replenishment water, drinking water supply, effluent discharge,

22   disposal, and  the Producers' contaminated wells.

23        311.    As a direct and proximate result of the defects previously described, the surface

24   water and groundwater within OCWD's territorial jurisdiction, including groundwater that serves

25   as the source of water to the contaminated wells and surface water that serves as the source of

26   replenishment water for the Basin, is and will continue to be, contaminated with PFOA and/or

27   PFOS and/or PFBS, causing damage to such groundwaters and causing Plaintiffs significant injury

28   and property damage. Restoration, repair, and/or remediation of the property damage alleged

1  herein has required Plaintiffs, and will continue to require Plaintiffs, to incur substantial costs and

2  expenses in an amount to be proved at trial.

3  312.  3M, when researching, designing, formulating, handling, disposing,

4  manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or

5  otherwise being responsible for its 3M Corona Products containing PFOS and/or PFOA and/or

6  PFBS, anticipated and should have accounted for the foreseeable risks posed by their PFAS

7  products.

8  313.  3M and Defendant DECRA are strictly, jointly, and severally liable for the damages

9  described in this Second Amended Complaint.

10  314.  3M knew and/or should have known that it was substantially certain that their

11  alleged acts and omissions described in this Second Amended Complaint would cause injury and

12  damage, including contamination of surface water and groundwater within OCWD's territorial

13  jurisdiction and the Producers' public water systems with PFOA, PFOS, and/or PFBS. 3M

14  committed each of the above-described acts and omissions knowingly, willfully, and with

15  oppression, fraud, or malice. Such conduct was performed to promote sales of PFOA, PFOS,

16  PFBS and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits, in

17  conscious disregard of the probable dangerous consequences of that conduct and its foreseeable

18  impact upon health, property and the environment, including the surface water, groundwater,

19  replenishment water, drinking water supply and the Producers contaminated wells. Therefore,

20  Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish

21  3M and that fairly reflects the aggravating circumstances alleged herein.

22  **THIRD CAUSE OF ACTION**
   **Strict Products Liability Based on Failure to Warn**
23  **(By all Plaintiffs against Manufacturing Defendants)**

24  315.  Plaintiffs repeat and restate the allegations set for in all previous paragraphs of this

25  Second Amended Complaint as if fully set forth herein.

26  316.  The Manufacturing Defendants were engaged in the business of researching,

27  designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing,

28  promoting, marketing, selling, and/or otherwise responsible for PFOA, PFOS, PFBS, and/or

- 52 -

products that contain PFOA and/or PFOS and/or PFBS.

317.   The Manufacturing Defendants represented, asserted, claimed, and warranted that PFOA, PFOS, PFBS and products containing PFOA, PFOS, PFBS and/or their precursors did not require any different or special handling or precautions to prevent risk and damage to human health and the environment.

318.   Products containing PFOA, PFOS, PFBS manufactured and/or supplied by the Manufacturing Defendants are defective and unreasonably dangerous products.

319.   Despite knowing of the dangers associated with the reasonably foreseeable use of their PFAS products, the Manufacturing Defendants failed to provide adequate or effective warnings of the risks of PFOA, PFOS, PFBS, and/or products containing PFOA, PFOS, PFBS, and/or their precursors, to users, consumer, intermediaries, regulators, and any other party that could have effectively reduced the risk of harm related to using PFOA and/or PFOS and/or PFBS and products that contain PFOA and/or PFOS and/or PFBS, of the products' character and the care required to use and dispose of the products safely.

320.   PFOA, PFOS, PFBS, and/or products containing PFOA, PFOS, PFBS, manufactured and/or supplied by the Manufacturing Defendants, were used in a manner in which they were foreseeably intended to be used.

321.   Because of the gravity of the risks and the severity of the harm posed by the Manufacturing Defendants' products, and because of the unique and sophisticated dangers inherent in PFOS and/or PFOA and/or PFBS and/or products containing PFOS and/or PFOA and/or PFBS, the Manufacturing Defendants could and should have taken additional steps to ensure that adequate or effective warnings were communicated     .

322.   As a direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, Plaintiffs have suffered monetary losses and damages in amounts to be proven at trial.

323.   The Manufacturing Defendants are strictly, jointly, and severally liable for the damages described above.

324.   The Manufacturing Defendants knew and/or should have known that it was

- 53 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
140

1   substantially certain that their alleged acts and omissions described in this Second Amended

2   Complaint would cause injury and damage, including contamination of surface water and

3   groundwater and drinking water supplies with PFOA, PFOS, PFBS. The Manufacturing

4   Defendants committed each of the above-described acts and omissions knowingly, willfully, and

5   with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA,

6   PFOS, PFBS, and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits,

7   in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable

8   impact upon health, property and the environment, including but not limited to surface water and

9   groundwater within OCWD's service area and Plaintiffs' contaminated wells. Therefore, Plaintiffs

10  also request an award of exemplary damages in an amount that is sufficient to punish these

11  Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

12  **FOURTH CAUSE OF ACTION**
    **Strict Products Liability Based on Failure to Warn**

13  **(By all Plaintiffs against 3M and Defendant DECRA)**

14      325.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

15  this Second Amended Complaint as if fully set forth herein.

16      326.    3M's manufacturing activities at the Corona Facility since approximately the 1940s

17  give rise to its liability in this cause of action.

18      327.    Based on information and belief, Defendant DECRA has an exclusive relationship

19  with 3M for purchase of roofing granules manufactured by 3M that on information and belief

20  contain PFOS and/or PFOA and/or PFBS, which DECRA incorporates into its own products,

21  warehouses them, and then ships its products throughout Plaintiffs' service areas, making DECRA

22  strictly liable as a member of the manufacturing chain of these defective products.

23      328.    Based on information and belief, 3M's Corona Products have contained and/or do

24  contain PFOS and/or PFOA and/or PFBS, during the time between the 1940s and today.

25      329.    3M was engaged in the business of researching, designing, formulating, handling,

26  disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling,

27  and/or otherwise being responsible for its 3M Corona Products.

28      330.    On information and belief, 3M represented, asserted, claimed, and warranted that

- 54 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
141

their 3M Corona Products did not require any different or special handling or precautions to prevent risk and damage to human health and the environment.

331.    Products containing PFOA, PFOS, and PFBS manufactured and/or supplied by the 3M are defective and unreasonably dangerous products.

332.    Despite knowing of the dangers associated with the reasonably foreseeable use of their 3M Corona Products, 3M failed to provide adequate or effective warnings of the risks of PFOA and PFOS and/or their precursors, to users, consumer, regulators, and any other party that could have effectively reduced the risk of harm related to using PFOA and/or PFOS and/or PFBS and products that contain PFOA and/or PFOS and/or PFBS, of the products' character and the care required to use and dispose of the products safely.

333.    3M's Corona Products were used in a manner in which they were foreseeably intended to be used.

334.    Because of the gravity of the risks and the severity of the harm posed by the 3M's Corona Products, and because of the unique and sophisticated dangers inherent in PFOS and/or PFOA and/or products containing PFOS and/or PFOA and/or PFBS, 3M could and should have taken additional steps to ensure that adequate or effective warnings were communicated.

335.    As a direct and proximate result of 3M's acts and omissions as alleged herein, Plaintiffs have suffered monetary losses and damages in amounts to be proven at trial.

336.    3M and Defendant DECRA—as a member of 3M's Corona Product chain of distribution—are strictly, jointly, and severally liable for the damages described above.

337.    3M knew and/or should have known that it was substantially certain that the alleged acts and omissions described in this Second Amended Complaint would cause injury and damage, including contamination of surface water and groundwater and drinking water supplies with PFOA, PFOS, and PFBS. 3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS, PFBS and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including but

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
142

1  not limited to surface water and groundwater within OCWD's service area and Plaintiffs'

2  contaminated wells. Therefore, Plaintiffs also request an award of exemplary damages in an

3  amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged

4  herein.

**FIFTH CAUSE OF ACTION**
**Continuing Trespass**
**(By all Plaintiffs against Manufacturing Defendants)**

7  338.   Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

8  this Second Amended Complaint as if fully set forth herein.

9  339.   Each of the Plaintiffs holds possessory property rights and interests in various

10  parcels of land that have been contaminated with PFAS.

11  340.   The Producers own, possess, and actively exercise rights to extract and use

12  groundwater drawn from their contaminated wells.

13  341.   OCWD appropriates surface water from multiple sources which is collected and

14  contained, then added to the Basin to recharge it. OCWD maintains an appropriative right to

15  reclaim or re-appropriate water it has recharged into the Basin.

16  342.   The Manufacturing Defendants were engaged in the business of researching,

17  designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing,

18  promoting, marketing, selling, and/or otherwise being responsible for PFOS, PFOA, PFBS, and/or

19  products that contain PFOS and/or PFOA and/or PFBS and knew or should have known that the

20  subsequent and foreseeable use and disposal of those compounds and products would contaminate

21  the groundwater and drinking water supply wells. Thus, the Manufacturing Defendants

22  intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity,

23  caused noxious and hazardous contaminants and pollutants to enter the surface water,

24  groundwater, replenishment water, and drinking water supply.

25  343.   PFOA, PFOS, and PFBS manufactured and/or supplied by the Manufacturing

26  Defendants continue to be located on or in Plaintiffs' property, and the surface water, groundwater,

27  replenishment water, and drinking water supply within OCWD's territorial jurisdiction, including

28  the groundwater that supplies water to the Plaintiffs' contaminated wells.

- 56 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
143

344. Plaintiffs did not, and do not, consent to the trespass alleged herein. The Manufacturing Defendants knew or reasonably should have known that Plaintiffs would not consent to this trespass.

345. The contamination of Plaintiffs' surface water, groundwater, and wells alleged herein has not yet ceased. PFOA, PFOS, and PFBS continue to migrate into and enter groundwater within OCWD's territorial jurisdiction and Plaintiffs' contaminated wells.

346. As a direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, the surface water, groundwater, replenishment water, and drinking water supply have been, and continue to be, contaminated with PFOA, PFOS, and PFBS, causing Plaintiffs significant injury and damage.

347. As a direct and proximate result of these Manufacturing Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the contamination of groundwater within OCWD's territorial jurisdiction and Plaintiffs' contaminated wells in an amount to be proved at trial.

348. As a further direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, Plaintiffs seek the value of the use of their property for the time of the wrongful occupation, the reasonable costs of repair or restoration of all of Plaintiffs' property to its original condition, costs associated with recovering the possession, any benefits or profits obtained by Manufacturing Defendants related to the trespass under *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal. App. 4th 583, and all other damages and remedies allowable under California Civil Code § 3334 and California law. The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Second Amended Complaint would cause injury and damage, including contamination of drinking water supplies with PFOA and PFOS. The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS, PFBS, and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits,

Exhibit 3
144

1  in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable

2  impact upon health, property, and the environment, including groundwater within OCWD's

3  territorial jurisdiction and Plaintiffs' contaminated wells. Therefore, Plaintiffs also request an

4  award of exemplary damages in an amount that is sufficient to punish these Manufacturing

5  Defendants and that fairly reflects the aggravating circumstances alleged herein.

**SIXTH CAUSE OF ACTION**
**Continuing Trespass – 3M and DECRA Corona Facilities**
**(By all Plaintiffs against 3M and Defendant DECRA)**

8  349.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

9  this Second Amended Complaint as if fully set forth herein.

10  350.    Each of the Plaintiffs holds possessory property rights and interests in various

11  parcels of land that have been contaminated with PFAS.

12  351.    The Producers own, possess, and actively exercise rights to extract and use

13  groundwater drawn from their contaminated wells.

14  352.    OCWD appropriates surface and groundwater from multiple sources which is

15  collected and contained, then added to the Basin to recharge it. OCWD maintains an appropriative

16  right to reclaim or re-appropriate water it has recharged into a river or the Basin.

17  353.    Through the operation, management, and maintenance of the 3M Corona Facility,

18  Defendant 3M intentionally, recklessly, or negligently caused PFAS to enter the surface water,

19  groundwater, replenishment water, and drinking water supply, and 3M knew or should have known

20  that the use and disposal of those compounds and products would contaminate the surface water,

21  groundwater, replenishment water, and drinking water supply. Thus, 3M intentionally, recklessly,

22  negligently or as the result of engaging in an extra-hazardous activity, was a substantial factor in

23  causing noxious and hazardous contaminants and pollutants to enter the surface water,

24  groundwater, replenishment water, and drinking water supply.

25  354.    PFOA, PFOS, and PFBS released, deposited, or disposed of by 3M at the 3M

26  Corona Facility continues to be located on or in Plaintiffs' property, and the surface water,

27  groundwater, replenishment water, and drinking water supply.

28  355.    Plaintiffs did not and do not consent to the trespass alleged herein. 3M individually

- 58 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
145

knew or reasonably should have known that Plaintiffs would not consent to this trespass.

356.  The contamination of Plaintiffs' surface water, groundwater and wells alleged herein has not yet ceased. PFAS continues to migrate into and enter the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water.

357.  Based on information and belief, Defendant DECRA's own manufacturing, storage, and distribution of PFAS products from its DECRA Corona Facilities caused and/or contributed to an increase of production and distribution of PFAS-containing products in or around the Basin, and/or the contamination from the 3M and DECRA Corona Facilities, contributing to the damages the Plaintiffs seek.

358.  As a direct and proximate result of 3M's and Defendant DECRA's acts and omissions as alleged herein, the Plaintiffs' contaminated wells and the surface water, groundwater, and replenishment water have been, and continue to be, contaminated with PFAS, causing Plaintiffs' significant injury and damage.

359.  As a direct and proximate result of 3M's and DECRA's acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water in an amount to be proved at trial.

360.  As a further direct and proximate result of 3M's and DECRA's acts and omissions as alleged herein, Plaintiffs seek the value of the use of their property for the time of the wrongful occupation, the reasonable costs of repair or restoration of all of Plaintiffs' property to its original condition, costs associated with recovering the possession, any benefits or profits obtained by Manufacturing Defendants related to the trespass under *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal. App. 4th 583, and all other damages and remedies allowable under California Civil Code § 3334 and California law.

361.  Defendant 3M knew and/or should have known that it was substantially certain that its alleged acts and omissions described in this Second Amended Complaint would cause injury and damage, including contamination of surface water, groundwater, replenishment water, and

- 59 -

drinking water supply with PFAS.

362.   Defendant 3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged herein.

**SEVENTH CAUSE OF ACTION**
**Public and Private Nuisance**
**(By all Plaintiffs against Manufacturing Defendants)**

363.   Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Second Amended Complaint as if fully set forth herein.

364.   OCWD is responsible for managing the vast groundwater basin that provides most of northern and central Orange County's drinking water. As part of its groundwater management, OCWD owns, manages and/or maintains aquifer recharge systems to replace the water that is pumped from wells belonging to local water agencies, cities and other groundwater users.

365.   The Producers are the owners of land, easements, and water rights which permit them to extract groundwater for use in their respective public water systems.

366.   The actions of the Manufacturing Defendants as alleged herein, have resulted in the continuing contamination of the Plaintiffs' contaminated wells, surface water, groundwater and replenishment water with PFAS, and such contamination is a public nuisance as defined in California Civil Code section 3479, California Civil Code section 3480, California Health and Safety Code section 5410, and California Water Code section 13050, and is reasonably abatable and varies over time. Each Manufacturing Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

367.   The actions of the Manufacturing Defendants constitute a nuisance in that the contamination of groundwater and drinking water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiffs' free use of their property, so as to

- 60 -

interfere with the comfortable enjoyment of life or property. The contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water significantly affects, at the same time, a considerable number of people in an entire community.

368.    By its design, the Manufacturing Defendants' PFOA, PFOS, and PFBS, and products containing PFAS, are known by Manufacturing Defendants to contain compounds that will likely be discharged to the environment in a manner that will create a nuisance and further failed to properly instruct intermediaries and end-users to properly use and dispose of such contaminants in such a manner that not create or contribute to the creation of a nuisance.

369.    The Manufacturing Defendants knew, or should have known, of the harmful effects and adverse impacts that exposure to PFOA and/or PFOS and/or PFBS would have on the environment and human health.

370.    The Manufacturing Defendants' conduct was a substantial factor in causing the creation of the nuisance at issue by marketing and promoting the use of PFOA and PFOS in a manner and directing and instructing intermediaries and end users of its products to dispose of products and materials containing PFOA, PFOS, and PFBS improperly and in a manner that Manufacturing Defendants knew or should have known would result in the contamination of the Plaintiffs' contaminated wells, public water systems, replenishment system, surface water, groundwater, and replenishment water.

371.    The Manufacturing Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiffs as a result of the contamination nuisance described herein. As a result of the Manufacturing Defendants' acts and omissions as alleged herein, the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water have been, and continue to be, contaminated with PFOA, PFOS, and/or PFBS, causing each Plaintiff significant injury and damage. As a result of the Manufacturing Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the PFOA, PFOS, and/or PFBS contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water in an amount to be proved at trial.

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
148

372.     Furthermore, as a result of the Manufacturing Defendants' acts and omissions as alleged herein, the contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water constitutes a continuing public nuisance because it is reasonably abatable and because the groundwater contamination at issue continues to migrate, move, and spread onto, into, across, and through the Basin and to impact Plaintiffs' public water systems, and its impact has thus varied, and continues to vary, over time.

373.     The Manufacturing Defendants have continued and will continue, unless restrained by this Court, to maintain the nuisance by failing to investigate, remove, and remediate the environmental contamination they are responsible for. Unless the Manufacturing Defendants are restrained by order of this Court from continuing their non-responsive course of conduct and failure to abate the contamination they have caused, it will be necessary for the Plaintiffs to commence many successive actions against the Manufacturing Defendants, and each of them, to secure compensation for damage sustained, thus requiring a multiplicity of suits.

374.     The Manufacturing Defendants are jointly and severally responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the PFAS that contaminate the aquifers supplying water to the contaminated wells do not present a risk to the public.

375.     Plaintiffs have been specially damaged because the Manufacturing Defendants' acts and omissions have unreasonably interfered with, and continue to interfere with, Plaintiffs' use and enjoyment of their property rights, water rights, interests in replenishment water, and public water systems, and have suffered and continue to suffer significant damages and injuries, including but not limited to, incurring costs related to the investigation, sampling, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the detection and remediation of the PFAS contamination of water supply and water replenishment systems.

376.     Plaintiffs did not and do not consent to the public nuisance alleged herein. The Manufacturing Defendants knew or reasonably should have known that Plaintiffs would not consent to this public nuisance.

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
149

377. As a direct and proximate result of the nuisance, Plaintiffs have been damaged within the three years preceding the filing of this lawsuit and are entitled to the compensatory damages alleged herein in an amount to be proven at trial, or to such other appropriate relief as the District may elect at trial, including, but not limited to, equitable relief in the form of an order requiring the Manufacturing Defendants to abate the nuisance.

378. The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Second Amended Complaint would cause injury and damage, including contamination of the contaminated wells, surface water, groundwater, and replenishment water with PFAS.

379. The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS, PFBS, and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including Plaintiffs' water supply and water replenishment systems. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

**EIGHTH CAUSE OF ACTION**
**Public and Private Nuisance – 3M and DECRA Corona Facilities**
**(By all Plaintiffs against 3M and Defendant DECRA)**

380. Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Second Amended Complaint as if fully set forth herein.

381. Plaintiffs are the owners of land, easements, and water rights which permit them to extract groundwater for use in their respective public water systems and to capture surface water to recharge and replenish the groundwater basin.

382. The operation, management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities have resulted in the continuing contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water by PFAS. Such contamination is a public nuisance as defined in California Civil Code section 3479, California

- 63 -

Civil Code section 3480, California Health and Safety Code section 5410, and California Water Code section 13050, and is reasonably abatable and varies over time. 3M has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

383.    The actions of 3M and DECRA through the operation, management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities constitute a nuisance; in that, the contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiffs' free use of their property, so as to interfere with the comfortable enjoyment of life or property. The contamination of the groundwater and public drinking water supply significantly affects, at the same time, a considerable number of people in an entire community.

384.    Defendant 3M was at all relevant times aware that PFAS compounds will likely be discharged to the environment in a manner that will create a nuisance and failed to properly use and dispose of such contaminants in such a manner that not create or contribute to the creation of a nuisance.

385.    Defendant 3M and Defendant DECRA, through their operation, management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities, knew, or should have known, of the harmful effects and adverse impacts that exposure to PFOA and/or PFOS and/or PFBS would have on the environment and human health.

386.    Based on information and belief, the actions of DECRA through the operation, management, and maintenance of the DECRA Corona Facilities constitute a nuisance in that the contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiffs' free use of their property, so as to interfere with the comfortable enjoyment of life or property. The contamination of the groundwater and public drinking water supply significantly affects, at the same time, a considerable number of people in an entire community. Defendant DECRA further caused and/or contributed to the increase of production and distribution of PFAS-containing products in or around the Basin, and/or the contamination

- 64 -

from the DECRA and 3M Corona Facilities, contributing to the damages Plaintiffs seek.

387.   Defendant 3M and Defendant DECRA, through their operation, management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities, caused or contributed to the creation of the nuisance at issue by releasing or disposing of products and materials containing PFAS in a manner that 3M and DECRA knew or should have known would result in the contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water.

388.   Defendant 3M's and Defendant DECRA's conduct was a substantial factor is causing the harm suffered by Plaintiffs as a result of the contamination nuisance described herein. As a result of 3M's and DECRA's acts and omissions as alleged herein, the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water have been, and continue to be, contaminated with PFOA and PFOS, causing each Plaintiff significant injury and damage. As a result of 3M's and DECRA's acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the PFAS contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water in an amount to be proved at trial.

389.   Furthermore, as a result of Defendant 3M's and Defendant DECRA's acts and omissions as alleged herein, the contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water constitutes a continuing public nuisance because it is reasonably abatable and because the groundwater contamination at issue continues to migrate, move, and spread onto, into, across, and through the Basin and to impact Plaintiffs' public water systems, and its impact has thus varied, and continues to vary, over time.

390.   Defendant 3M and Defendant DECRA have continued and will continue, unless restrained by this Court, to maintain the nuisance by failing to investigate, remove, and remediate the environmental contamination it is responsible for. Unless the 3M and DECRA are restrained by order of this Court from continuing their non-responsive course of conduct and failure to abate the contamination they have caused, it will be necessary for the Plaintiffs to commence many successive actions against 3M and DECRA, to secure compensation for damage sustained, thus

- 65 -

1    requiring a multiplicity of suits.

2        391.   Defendant 3M and Defendant DECRA are responsible to take such action as is

3    necessary to abate the public nuisance and to take such action as is necessary to ensure that the

4    PFOA and PFOS that contaminate the aquifers supplying water to the Providers' public water

5    systems do not present a risk to the public.

6        392.   Plaintiffs have been specially damaged because Defendant 3M's and Defendant

7    DECRA's acts and omissions have unreasonably interfered with, and continue to interfere with,

8    Plaintiffs' use and enjoyment of the aquifer and their public replenishment and public water

9    systems and have suffered and continue to suffer significant damages and injuries, including but

10   not limited to, investigation, sampling, remediation, treatment system design, acquisition,

11   installation, operations and maintenance, and other costs and damages related to the contamination

12   of the surface water, groundwater, replenishment water, drinking water supply, effluent discharge,

13   disposal, and  the Producers' contaminated wells.

14       393.   Plaintiffs did not and do not consent to the public nuisance alleged herein.

15   Defendant 3M and Defendant DECRA knew or reasonably should have known that Plaintiffs

16   would not consent to this public nuisance.

17       394.   As a direct and proximate result of the nuisance, Plaintiffs have been damaged,

18   including but not limited to damages suffered within the three years preceding the filing of this

19   lawsuit and are entitled to the compensatory damages alleged herein in an amount to be proven at

20   trial, or to such other appropriate relief as the District may elect at trial, including, but not limited

21   to, equitable relief in the form of an order requiring Defendant 3M and Defendant DECRA to abate

22   the nuisance.

23       395.   Defendant 3M and Defendant DECRA knew and/or should have known that it was

24   substantially certain that its alleged acts and omissions described in this Second Amended

25   Complaint would cause injury and damage, including contamination of the Plaintiffs'

26   contaminated wells, surface water, groundwater, and replenishment water with PFAS.

27       396.   Defendant 3M committed each of the above-described acts and omissions

28   knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in

- 66 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
153

conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged herein.

**NINTH CAUSE OF ACTION**
**NEGLIGENCE**
**(By all Plaintiffs against the Manufacturing Defendants)**

397.     Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Second Amended Complaint as if fully set forth herein.

398.     The Manufacturing Defendants had a duty to the Plaintiffs to exercise due care in the researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling and instructions for the use and disposal of PFAS and products containing PFAS.

399.     The Manufacturing Defendants breached their duty of care in that they negligently, carelessly, and/or recklessly researched, designed, formulated, handled, disposed, manufactured, labeled, used, tested, distributed, promoted, marketed, sold and/or instructed for use and disposal of PFAS and products containing PFAS and directly and proximately caused PFAS contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water in an amount to be proved at trial.

400.     The Manufacturing Defendants breached their duty of care in that they negligently, carelessly, and/or recklessly researched, designed, formulated, handled, disposed, manufactured, labeled, used, tested, distributed, promoted, marketed, sold and/or instructed for use and disposal of PFAS and products containing PFAS when they knew, or should have known, that PFAS would: (i) be released into the environment from industrial, commercial and consumer uses and sources; (ii) be released and contaminate the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water.

401.     Despite their knowledge that contamination with PFAS was the inevitable consequence of their conduct as alleged herein, the Manufacturing Defendants failed to provide

- 67 -

Exhibit 3
154

reasonable warnings or special instructions, failed to take other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of PFAS in their product information and/or instructions for use.

402.    As a direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, the Plaintiffs have suffered monetary losses and damages in amounts to be proven at trial. The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Second Amended Complaint would cause injury and damage, including contamination of the contaminated wells, surface water, groundwater, and replenishment water with PFAS.

403.    The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS, PFBS, and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including Plaintiffs' water supply and water replenishment systems. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish the Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

**TENTH CAUSE OF ACTION**
**NEGLIGENCE – 3M AND DECRA CORONA FACILITIES**
**(By all Plaintiffs against 3M and Defendant DECRA)**

404.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Second Amended Complaint as if fully set forth herein.

405.    Defendant 3M and Defendant DECRA had a duty to use due care in the handling, control, disposal, release, remediation, and use of PFOS, PFOA, and/or PFBS at and from their Corona Facilities.

406.    Defendant 3M and Defendant DECRA negligently, carelessly, and recklessly handled, controlled, failed to control, disposed, released, remediated or failed to remediate, and used PFOS, PFOA, PFBS, and products containing PFOS, PFOA, and/or PFBS, that it contaminated, threatened, and polluted the Basin and the Plaintiffs' contaminated wells and the

- 68 -

Exhibit 3
155

groundwaters and aquifer that supply them with PFAS, resulting in the damages alleged in this Second Amended Complaint.

407.    3M, among other things, negligently, carelessly, and recklessly failed to, and is negligently, carelessly, and recklessly failing to (i) prevent spills, leaks, disposal, discharges and releases of PFAS through the use of appropriate technology; (ii) install and maintain systems to prevent spills, leaks, disposal, discharges, and releases, and facilitate prompt detection and containment of any spills, leaks, disposal, discharges, and releases; (iii) monitor and discover spills, leaks, disposal, discharges, and releases as soon as possible; (iv) warn those who may be injured as a result of spills, leaks, disposal, discharges and releases; and (v) clean up, contain and abate spills, leaks, disposal, discharges, and releases to prevent harm and injury to the Plaintiffs.

408.    3M knew, or should have known, that its activities would spill, leak, discharge, and release PFAS into the soil and contaminate surface water and groundwater.

409.    As a direct and proximate result of 3M's past and ongoing acts and omissions as alleged herein, Plaintiffs have incurred, including but not limited to within the three years preceding the filing of this lawsuit, are incurring, and will continue to incur, investigation, remediation, treatment, and disposal costs and expenses required to restore groundwater and drinking water resources, and other damages as alleged herein, in an amount to be proved at trial.

410.    3M knew and/or should have known that it was substantially certain that its alleged acts and omissions described in this Second Amended Complaint would cause injury and damage, including contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water with PFAS. 3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including the contaminated wells, surface water, groundwater, and replenishment water. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged herein.

411.    Upon information and belief Defendant DECRA maintains a manufacturing facility

- 69 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
156

at 1230 Railroad Street, Corona, California 92882 and a warehousing, shipping, and receiving facility at an adjacent property at 235 N. Sherman Avenue, Corona, California 92882. Upon information and belief Defendant DECRA purchases specialty roofing granules from the 3M Corona Facility and then manufactures those 3M specialty roofing granules, which include PFAS ingredients, into its DECRA Roofing Products that are warehoused at, then shipped from Defendant DECRA's Corona, California facilities to customers throughout Plaintiffs' respective service areas. On information and belief, Defendant DECRA's manufacture and storage of PFOA and PFOS-containing roofing materials has caused or contributed to contamination of the Basin as well as the Plaintiffs' contaminated wells and the groundwaters and aquifer that supply them with PFAS, resulting in the damages alleged in this Second Amended Complaint.

412. On information and belief, Defendant DECRA's acts and omissions operating its Corona facilities are similar to 3M's acts and omissions operating its 3M Corona Facility as set forth above.

**ELEVENTH CAUSE OF ACTION**
**OCWD Act Section 8**
**(By OCWD against Manufacturing Defendants and Defendant DECRA)**

413. Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Second Amended Complaint as if fully set forth herein.

414. The OCWD Act authorizes OCWD to "expend available funds to perform any cleanup, abatement, or remedial work required under the circumstances which, in the determination of the board of directors, is required by the magnitude of the endeavor or the urgency of prompt action needed to prevent, abate, or contain any threatened or existing contamination of, or pollution to, the surface or groundwaters of the district. This action may be taken in default of, or in addition to, remedial work by the person causing the contamination or pollution, or other persons." (OCWD Act § 8(b)).

415. The Act further provides "the contamination or pollution is cleaned up or contained, the effects thereof abated, or in the case of threatened contamination or pollution, other necessary remedial action is taken, the person causing or threatening to cause that contamination or pollution shall be liable to the district to the extent of the reasonable costs actually incurred in cleaning up

- 70 -

or containing the contamination or pollution, abating the effects of the contamination or pollution, or taking other remedial action. The amount of those costs, together with court costs and reasonable attorneys' fees, shall be recoverable in a civil action by, and paid to, the district." (OCWD Act § 8(c)).

416.    OCWD's Board of Directors (the "Board") has determined that investigation and remedial work is required given the magnitude of PFAS contamination and the potential impacts to public health, as described in this Second Amended Complaint, and that prompt action is needed and legally required to clean up or contain the contamination or pollution, abate the effects of the contamination or pollution, or take other remedial action to prevent, abate, contain, and dispose of threatened and existing contamination. The Board has authorized the expenditure of funds to conduct such investigation and remediation and has authorized action to recover all costs and damages associated with such contamination.

417.    The Manufacturing Defendants and DECRA caused OCWD to conduct investigations into the quality of the groundwater within OCWD's territorial jurisdiction to determine whether those waters are contaminated or polluted with PFAS at a substantial cost to OCWD in an amount to be proved at trial.

418.    Defendants caused OCWD to perform cleanup, abatement, and/or remedial work needed to prevent, abate, and/or contain threatened or existing contamination of, or pollution to, the groundwater, including the aquifer, within OCWD's territorial jurisdiction, all at a substantial cost to OCWD an amount to be proved at trial.

419.    In addition, the actions of 3M and DECRA through the operation, management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities, were a substantial factor in causing the contamination of the groundwater, and have caused OCWD to perform cleanup, abatement, and/or remedial work needed to prevent, abate, and/or contain threatened or existing contamination of, or pollution to, the groundwater, including the aquifer, within OCWD's territorial jurisdiction, all at a substantial cost to OCWD in an amount to be proved at trial.

420.    As a direct and proximate cause of the Defendants' acts and omission, OCWD initiated a program to assess, evaluate, investigate, monitor, abate, clean up, correct, contain the

- 71 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
158

1  contamination of the aquifer and remove PFAS from drinking water being served to citizens and

2  businesses, and/or take other necessary remedial action, all at significant expense, cost, loss, and

3  damage in amounts to be proved at trial.

4      421.    As a direct and proximate result of the acts and omissions alleged in this Second

5  Amended Complaint, the OCWD has and/or will incur substantially increased expenses, all to

6  OCWD's damage, in an amount to be proved at trial. OCWD has and will incur costs and

7  attorney's fees prosecuting this action. OCWD is entitled to recover all such damages, together

8  with court costs and reasonable attorney's fees, in this action.

9      422.    As a direct and proximate result of the Defendants' conduct, OCWD is entitled to

10  recover all past, present, and future response costs, together with interest from the Defendants, as

11  well as damages for injury, loss, and damages to natural resources.

12  **TWELFTH CAUSE OF ACTION**
**Declaratory Relief**

13  **(By all Plaintiffs against Manufacturing Defendants and Defendant DECRA)**

14      423.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

15  this Second Amended Complaint as if fully set forth herein.

16      424.    The Manufacturing Defendants knew, or should have known, that PFAS, when

17  used in a foreseeable and intended manner, were dangerous and created an unreasonable and

18  excessive risk of harm to human health and the environment.

19      425.    The Manufacturing Defendants intentionally, willfully, deliberately and/or

20  negligently failed to properly handle, control, dispose, and release noxious and hazardous

21  contaminants and pollutants, such that Defendants created substantial and unreasonable threats to

22  human health and the environment, which resulted from the foreseeable and intended use and

23  storage of PFAS and products containing those substances.

24      426.    In addition, Defendant 3M and Defendant DECRA, through their operation,

25  management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities,

26  intentionally, willfully, deliberately and/or negligently failed to properly handle, control, dispose,

27  and release noxious and hazardous contaminants and pollutants, such that Defendants created

28  substantial and unreasonable threats to human health and the environment, which resulted from

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
159

1    the foreseeable and intended use and storage of PFAS and products containing those substances.

2        427.    Among other things, OCWD must take costly remedial action to remove PFAS

3    contamination which will result in substantial costs, expenses and damages in an amount to be

4    proved at trial.

5        428.    These Defendants, and each of them, have failed to reimburse OCWD and the

6    Plaintiffs for OCWD's investigation, remediation, cleanup, and disposal costs and deny any

7    responsibility or liability for these damages and expenses the OCWD will incur in the future.

8        429.    An actual controversy exists concerning who is financially responsible for abating

9    actual or threatened pollution or contamination of groundwater resources, including the aquifer,

10   and Plaintiffs' contaminated wells within OCWD's territorial jurisdiction by PFAS.

11       430.    In order to resolve this controversy, OCWD seeks an adjudication of the respective

12   rights and obligations of the parties, and other relief to the extent necessary to provide full relief

13   to OCWD.

14                      **THIRTEENTH CAUSE OF ACTION**
       **California Civil Code Sec. 3439.04(a)(1) (2004) and Delaware Code tit. 6 Sec. 1304(a)(1)**
15              **Actual Fraudulent Transfer in Relation to Chemours Spinoff**
            **(By all Plaintiffs against Old DuPont, Chemours, New DuPont, and Corteva)**
16

17       431.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

18   this Second Amended Complaint as if fully set forth herein.

19       432.    Plaintiffs seek equitable and other relief pursuant to the UFTA, against Old DuPont

20   and Chemours.

21       433.    Through its participation in the Chemours spinoff, as detailed above, Chemours

22   transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Chemours

23   Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation

24   Agreement (the "Chemours Assumed Liabilities").

25       434.    The Chemours Transfers and Chemours Assumed Liabilities were made for the

26   benefit of Old DuPont.

27       435.    At the time that the Chemours Transfers were made and the Chemours Assumed

28   Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a

                                    - 73 -
                 SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
160

1    position to, and in fact did, control and dominate Chemours.

2          436.    Old DuPont and Chemours acted with the actual intent to hinder, delay, and defraud

3    creditors or future creditors.

4          437.    Plaintiffs have been harmed as a result of the Chemours Transfers.

5          438.    Old DuPont and Chemours engaged in acts in furtherance of a scheme to transfer

6    its assets out of the reach of parties such as the Plaintiffs have been damaged as a result of the

7    actions described in this Second Amended Complaint.

8          439.    Pursuant to the UFTA and Delaware Code tit. 6 Sec. 1301 to 1312 the Plaintiffs

9    seek to avoid the Chemours Transfers and to recover property or value that Chemours transferred

10   to Old DuPont.

11         440.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's

12   liability described above.

13         441.    Plaintiffs further reserve such other rights and remedies that may be available to

14   them under the UFTA as may be necessary to fully compensate the Plaintiffs for the damages and

15   injuries they have suffered as alleged in this Second Amended Complaint.

16                          **FOURTEENTH CAUSE OF ACTION**
                **California Civil Code Sec. 3439.04(5) (2004) and Delaware Code tit. 6 Sec. 1305**
17              **Constructive Fraudulent Transfer In Relation To Chemours Spinoff**
                **(By all Plaintiffs against Old DuPont, Chemours, New DuPont, and Corteva)**
18

19         442.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

20   this Second Amended Complaint as if fully set forth herein.

21         443.    Plaintiffs seek equitable and other relief pursuant to the UFTA against Old DuPont

22   and Chemours.

23         444.    Chemours did not receive reasonably equivalent value from Old DuPont in

24   exchange for the Chemours Transfers and Chemours Assumed Liabilities.

25         445.    Each of the Chemours Transfers and Chemours' assumption of the Chemours

26   Assumed Liabilities was made to or for the benefit of Old DuPont.

27         446.    At the time that the Chemours Transfers were made and the Chemours Assumed

28   Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in

- 74 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
161

1    fact did, control and dominate Chemours.

2       447.   Chemours made the Chemours Transfers and assumed the Chemours Assumed

3   Liabilities when it was engaged or about to be engaged in a business for which its remaining assets

4   were unreasonably small in relation to its business and debt obligations.

5       448.   Chemours was insolvent at the time or became insolvent as a result of the Chemours

6   Transfers and its assumption of the Chemours Assumed Liabilities.

7       449.   At the time that the Chemours Transfers were made and Chemours assumed the

8   Chemours Assumed Liabilities, Chemours intended to incur, or believed or reasonably should have

9   believed that it would incur debts beyond its ability to pay as they became due.

10      450.   Plaintiffs have been harmed as a result of the Chemours Transfers.

11      451.   Pursuant the UFTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs seek to

12   avoid the Transfers and to recover property or value transferred to Old DuPont.

13      452.   Upon information and belief, Corteva and New DuPont assumed Old DuPont's

14   liability described above.

15      453.   Plaintiffs further reserve such other rights and remedies that may be available to

16   them under the UFTA and UVTA as may be necessary to fully compensate Plaintiffs for the

17   damages and injuries they have suffered as alleged in this Second Amended Complaint.

18                             **FIFTEENTH CAUSE OF ACTION**

19   **California Civil Code section 3439.04(a)(1)(2016) and Delaware Code tit. 6 Sec. 1304(a)(1)**
**Actual Fraudulent Transfer in Relation to Dow-DuPont Merger and**

20   **Subsequent Restructurings, Asset Transfers and Separations**
**(By all Plaintiffs against Old DuPont, New DuPont, and Corteva)**

21      454.   Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

22   this Second Amended Complaint as if fully set forth herein.

23      455.   Plaintiffs seek equitable and other relief pursuant to the UVTA against Old DuPont,

24   New DuPont, and Corteva.

25      456.   Following the Dow-DuPont Merger, and through the separations of New DuPont,

26   New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and

27   business lines to Corteva and New DuPont (the "Old DuPont Transfers").

28      457.   The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

- 75 -

458.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

459.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

460.    Plaintiffs have been harmed as a result of the Old DuPont Transfers.

461.    Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiffs that have been damaged as a result of the actions described in this Second Amended Complaint.

462.    Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs seek to avoid the Transfers and to recover property or value transferred to New DuPont and Corteva.

463.    Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs also seek to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of the Plaintiffs.

464.    Plaintiffs further reserve such other rights and remedies that may be available to them under the UVTA as may be necessary to fully compensate Plaintiffs for the damages and injuries they have suffered as alleged in this Second Amended Complaint.

**SIXTEENTH CAUSE OF ACTION**
**California Civil Code section 3439.04(5)(2016) and Delaware Code tit. 6 Sec. 1305**
**Constructive Fraudulent Transfer in Relation to Dow-DuPont Merger and**
**Subsequent Restructurings, Asset Transfers and Separations**
**(By all Plaintiffs against Old DuPont, New DuPont, and Corteva)**

465.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Second Amended Complaint as if fully set forth herein.

466.    Plaintiffs seek equitable and other relief pursuant to the UVTA against Old DuPont, New DuPont, and Corteva.

467.    Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

468.    Each of the Old DuPont Transfers was made to or for the benefit of New DuPont

- 76 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
163

or Corteva.

469.     At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

470.     Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

471.     Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

472.     At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

473.     Plaintiffs have been harmed as a result of the Old DuPont Transfers.

474.     Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs seek to avoid the Transfers and to recover property or value transferred to New DuPont and Corteva.

475.     Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs also seek to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of the Plaintiffs.

476.     Plaintiffs further reserve such other rights and remedies that may be available to them under the UVTA as may be necessary to fully compensate the Plaintiffs for the damages and injuries they have suffered as alleged in this Second Amended Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request a trial of this action before a jury, and that, upon a favorable verdict, this Court enter judgment in favor of Plaintiffs and against Defendants, jointly and severally, as follows:

A.     An award of compensatory damages according to proof;

B.     An award pursuant to California Civil Code § 3334 of the value of the use of

- 77 -

Exhibit 3
164

1   Plaintiffs' property for the time of the wrongful occupation, the reasonable costs of repair or

2   restoration of all of Plaintiffs' property to its original condition, costs associated with recovering

3   the possession, any benefits or profits obtained by Manufacturing Defendants and Defendant

4   DECRA, and all other damages and remedies allowable under California Civil Code § 3334 and

5   California law;

6       C.      An award of exemplary and punitive damages according to proof;

7       D.      An order declaring that Defendants' actions constitute a nuisance and requiring

8   Defendants to take such action as is necessary to abate the public nuisance, to take such action as

9   is necessary to ensure that the PFAS that contaminate the aquifers supplying water to the Plaintiffs'

10  public water systems do not present a risk to the public, and to award damages to the Plaintiffs

11  caused by the nuisance;

12      E.      An order declaring that Defendants are financially responsible for abating actual or

13  threatened pollution or PFAS contamination of groundwater resources, including the aquifer

14  within OCWD's service area and Plaintiffs' contaminated wells;

15      F.      An order that Plaintiffs are entitled to avoid the Chemours Transfers to Old DuPont

16  to the extent necessary to satisfy Plaintiffs' claims;

17      G.      An order that Plaintiffs are entitled to avoid the Old DuPont Transfers to New

18  DuPont and Corteva to the extent necessary to satisfy Plaintiffs' claims;

19      H.      An order appointing a receiver to take charge of the assets transferred or its

20  proceeds and such other relief the circumstances may require;

21      I.      An order enjoining New DuPont from distributing, transferring, capitalizing, or

22  otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or

23  other assets that formerly belonged to Old DuPont;

24      J.      An order imposing a constructive trust over any such proceeds for the benefit of the

25  Plaintiffs;

26      K.      An award of Plaintiffs' costs in prosecuting this action, including reasonable

27  attorneys' fees, together with prejudgment interest to the full extent permitted by law; and

28      L.      An award of such other further relief as the Court may deem just and proper.

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
165

Dated: May 19, 2021             Respectfully submitted,

                                **SL ENVIRONMENTAL LAW GROUP, PC**

                          By:    /s/ *Kenneth A. Sansone*
                                Alexander I. Leff
                                Kenneth A. Sansone
                                Seth D. Mansergh

                                **ROBINSON CALCAGNIE, INC.**

                          By:    /s/ *Daniel S. Robinson*
                                Daniel S. Robinson
                                Michael W. Olson

                                **KELLEY DRYE & WARREN LLP**

                          By:    /s/ *Andrew W. Homer*
                                Andrew W. Homer

                                ***Attorneys for Plaintiffs***

- 79 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
166

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all claims and causes of action in this lawsuit.

Dated: May 19, 2021                    Respectfully submitted,

**SL ENVIRONMENTAL LAW GROUP, PC**

By:    /s/ *Kenneth A. Sansone*
        Alexander I. Leff
        Kenneth A. Sansone
        Seth D. Mansergh

**ROBINSON CALCAGNIE, INC.**

By:    /s/ *Daniel S. Robinson*
        Daniel S. Robinson
        Michael W. Olson

**KELLEY DRYE & WARREN LLP**

By:    /s/ *Andrew W. Homer*
        Andrew W. Homer

***Attorneys for Plaintiffs***

- 80 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
167

1

## STATE OF CALIFORNIA, COUNTY OF ORANGE

2

3

I am over the age of 18, employed in the County of Orange, State of California, and not a party to the within action; my business address is 19 Corporate Plaza Drive, Newport Beach, CA 92660.

4

On May 19, 2021, I served a copy of the foregoing document described as:

5

## SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF AND DEMAND FOR JURY TRIAL

6

7

on the party or parties named below, by placing a true copy thereof enclosed in sealed envelopes, and sent as follows:

8

## SEE ATTACHED SERVICE LIST

9

10

11

12

__     **BY FIRST CLASS MAIL as follows**:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on the same day with postage thereon fully prepaid at Newport Beach. California in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (l) day after date of deposit for mailing in affidavit. Service by mail was to the parties as stated on the attached service list.

13

14

__     **BY PERSONAL SERVICE as follows**:  I caused such documents to be served via Personal Service via First Legal Support Services on the offices of the addressees, as stated below.

15

16

_X_     **BY ELECTRONIC SERVICE as follows:** I provided the document(s) listed above via email to counsel as stated on the attached service list.

17

18

19

__     **BY FEDERAL EXPRESS OVERNITE SERVICES as follows:**  by placing the document(s) listed above in a sealed envelope and consigning it to an express mail service for guaranteed delivery on the next business day following the date of consignment to the address set forth below.  A copy of the consignment slip is attached to this proof of service.

20

21

22

23

__     **BY FACSIMILE SERVICE as follows**:  by transmitting via facsimile on this date from fax number 949-720-1292 the document(s) listed above to the fax number(s) set forth below. The transmission reported complete and without error. The transmission report, which is attached to this proof of service, was properly issued by the transmitting fax machine. Service by fax was made by agreement of the parties, confirmed in writing. The transmitting fax machine complies with Cal.R.Ct. 2003(3).

24

25

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

26

Executed on this 19th day of May 2021, at Newport Beach, California.

27

_Jennifer Rogers_

28

Jennifer D. Rogers

- 81 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
168

*Orange County Water District v. 3M Company, et al.*
**OCSC Case No.: 30-2020-01172419-CU-PL-CXC**

### SERVICE LIST

Gregory R. Jones, Esq.
Kevin Kin, Esq.
McDERMOTT WILL & EMERY LLP
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
(310) 277-4110; Fax: (310) 277-4730
gjones@mwe.com
kevinkim@mwe.com

Christopher M. Murphy, Esq.
McDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60606-0029
(312) 372-2000; Fax: (312) 984-7700
cmurphy@mwe.com

Jacob Hollinger, Esq.
McDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173-1922
(212) 547-5400; Fax: (212) 547-5444
jhollinger@mwe.com

*Attorneys for Defendant*
*DECRA ROOFING SYSTEMS, INC.*

Martha N. Donovan, Esq.
Margaret Raymond-Flood, Esq.
NORRIS MCLAUGHLIN, P.A.
400 Crossing Boulevard, 8th Floor
Bridgewater, NJ 08807
(908) 722-0700
mndonovan@norris-law.com
mraymondflood@norris-law.com

Rudy R. Perrino, Esq.
KUTAK ROCK LLP
777 S. Figueroa Street, Suite 4550
Los Angeles, CA 90017
(213) 312-4023
rudy.perrino@kutakrock.com
*Attorneys for Defendant*
*THE CHEMOURS COMPANY (as to COA 14-17)*

- 82 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
169

E. Alex Beroukhim
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
alex.beroukhim@arnoldporter.com

*Attorneys for Defendant*
*THE CHEMOURS COMPANY*
*(as to COA 14-15)*

John Nadolenco, Esq.
Daniel Queen, Esq.
MAYER BROWN LLP
350 S. Grand Ave., 25th Floor
Los Angeles, CA 90071
(213) 229-9500; Fax: (213) 625-0248
dqueen@mayerbrown.com

J. Tom Boer, Esq.
HOGAN LOVELLS US LLP
3 Embarcadero Center, Suite 1500
San Francisco, CA 94111
(415) 374-2300; Fax: (415) 374-2499
tom.boer@hoganlovells.com

*Attorneys for Defendant,*
*3M COMPANY*

Andrew T. Mortl, Esq.
Adam M. Rapp, Esq.
GLYNN & FINLEY, LLP
One Walnut Creek Center
100 Pringle Avenue, Suite 500
Walnut Creek, CA 94596
(925) 210-2800; Fax: (925) 945-1975
amortl@glynnfinley.com;
arapp@glynnfinley.com

Lanny S. Kurzwell
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry St
Newark, NJ 07102
(973) 639-2044
lkurzweil@mccarter.com

- 83 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
170

John J. McAleese III, Esq.
MCCARTER & ENGLISH, LLP
1600 Market St, Suite 3900
Philadelphia, PA 19103
(215) 979-3892
jmcaleese@mccarter.com

*Attorneys for Defendants*
**E. I. DU PONT DE NEMOURS AND COMPANY and**
**THE CHEMOURS COMPANY (as to all claims**
**except COA 14-17)**

Paul Murphy, Esq.
MURPHY ROSEN LLP
100 Wilshire Blvd., Suite 1300
Santa Monica, CA 90401
(310) 899-3300; Fax: (310) 399-7201
pmurphy@murphyrosen.com

*Attorneys for Defendants,*
*E. I. DUPONT DE NEMOURS AND COMPANY*
*(as to COA 14-17) and DUPONT DE NEMOURS, INC.*

Katherine Hacker, Esq.
John Phillips, Esq.
BARTLIT BECK LLP
1801 Wewatta, Suite 1200
Denver, CO 80202
(303) 592-3141
kat.hacker@bartlitbeck.com
john.phillips@bartlitbeck.com

Kate Roin, Esq.
BARTLIT BECK LLP
54 W. Hubbard St., Suite 300
Chicago, IL 60654
(312) 494-4440
kate.roin@bartlitbeck.com

*Attorneys for Defendants,*
*E. I. DUPONT DE NEMOURS AND COMPANY*
*(as to COA 14-17) and DUPONT DE NEMOURS, INC.*
*and CORTEVA, INC.*

- 84 -

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Exhibit 3
171